CARRIERS TRAFFIC SERVICE, INC.,
Plaintiff–Appellant,

v.

ANDERSON, CLAYTON & COMPANY,
Defendant–Appellee,

and

United States of America and Interstate Commerce Commission,
Defendants–Appellees.

INMAN FREIGHT SYSTEMS, INC. and Jim S. Green, Trustee,
Plaintiffs–Appellants,

v.

BOISE CASCADE CORPORATION,
Defendant–Appellee,

and

United States of America and Interstate Commerce Commission,
Defendants–Appellees.

ORSCHELN BROTHERS TRUCK LINES, INC., Barry S. Schermer, Trustee, Assignor, and Carriers Traffic Service, Inc., Assignee, Plaintiffs/Petitioners–Appellants,

v.

COOPER INDUSTRIES, INC.,
Defendant–Appellee,

and

United States of America and Interstate Commerce Commission,
Respondents–Appellees.

Nos. 88–2697, 88–2707 and 88–3053.

United States Court of Appeals,
Seventh Circuit.

Argued April 12, 1989.

Decided Aug. 7, 1989.

Steven C. Weiss, Ronald M. Hill, Weiss & Associates, Chicago, Ill., for Carriers Traffic Service, Inc., Inman Freight Systems, Inc. and Jim Green.

James K. Perrin, Paul V. Byrne, Jr., Haskell & Perrin, Chicago, Ill., for Anderson, Clayton & Co., U.S., and I.C.C.

Patrick H. Smyth, Smyth & Associates, Chicago, Ill., Karen Gowland, Boise, Idaho, for Boise Cascade Corp.

Jeanne M. Witherspoon and Gail C. Ginsberg, Asst. U.S. Attys., Office of the U.S. Atty., Chicago, Ill., for U.S. and I.C.C.

Steven C. Weiss, Steven D. Armamentos, Weiss & Associates, Chicago, Ill., for Orscheln Bros. Truck Lines, Inc., Barry Schermer and Carriers Traffic Service, Inc.

Dale R. Crider, Rivkin, Radler, Dunne & Bayh, Chicago, Ill., Richard D. Fortin, Donelan, Cleary, Wood & Maser, Washington, D.C., for Cooper Industries, Inc.

Before WOOD, Jr., CUDAHY, and KANNE, Circuit Judges.

CUDAHY, Circuit Judge.

These consolidated cases arise from identical disputes over retroactive application of a "shipper load and count" notation requirement for a reduced rate tariff. In all three cases goods were shipped, and shippers billed, under a reduced rate. In order to obtain the reduced rate, shippers were required to load their goods, count them and make notations on the bills of lading indicating that they had performed the loading and counting. The evidence in all three cases before us indicates that these shippers performed the loading and counting as required;[1] unfortunately, however, they did not comply with the notation requirement. The carriers subsequently filed for bankruptcy and, in the course of preparing for bankruptcy proceedings, auditors discovered that the pertinent bills of lading lacked the requisite notations. The carriers attempted to retroactively change the reduced rates to higher rates and collect the difference from the shippers. The shippers objected to this attempt at retroactive imposition of higher tariff rates. All three cases were referred by the district court to the Interstate Commerce Commission (the "ICC"), which determined that retroactive application of the notation requirement in order to impose a higher tariff in any of these cases would be unrea-

---

1. Although there is some dispute over whether some of the shippers actually did the counting, the ICC in each case found that the shippers had loaded and counted the shipments.

sonable. The district court opinions granted summary judgment in favor of the ICC and the shippers. We affirm.

I.

The three consolidated cases involve very similar factual settings. In *Inman Freight Systems, Inc. v. Boise Cascade Corp.* (No. 88–2707), Inman Freight Systems, Inc. ("Inman") sues Boise Cascade Corporation ("Boise Cascade") to collect alleged freight undercharges. During 1980 and 1981, Inman transported metal can ends from Tennessee to Missouri for Boise Cascade.[2] Inman billed Boise Cascade under published tariff rate ICC MWB 240 Item 11280, subject to ICC MWB 125 Item 578, which provides:

(1) At the time of shipment, consignor must endorse on the Bill of Lading and Shipping Order the notation "Consignor load and count and/or consignee must unload" the shipments as the case may be.

    \*    \*    \*    \*    \*    \*

(2) If the consignor fails to comply with the requirements of paragraph (1) herein, or if for any reason the consignor or any party tendering any portion of the shipment refuses to perform the loading and counting, the rate will not apply and rates otherwise published will be assessed.

When Inman later filed for bankruptcy, its auditor (Carriers Traffic Service) discovered that the notation requirement had not been met and billed Boise Cascade for the balance due under the higher tariff rate. Boise Cascade refused to pay this balance and Inman filed suit in the district court. The district court referred the action to the ICC for a determination whether retroactive imposition of the higher tariff was reasonable. The ICC initially ruled that imposition of the higher rate was reasonable, but subsequently reopened the proceeding and reversed its initial decision on appeal. The ICC then declined Inman's petition for a partial stay of its decision. When the case returned to the district court, Judge Aspen granted the ICC and Boise Cascade summary judgment as to the "shipper load and count" notation issue.

*Carrier's Traffic Serv., Inc. v. Anderson, Clayton & Co.* (No. 88–2697) similarly involves the retroactive invocation of the "notation" requirement in order to raise the applicable tariff rate. Orscheln Brothers Truck Lines, Inc. ("Orscheln") transported food products for Anderson, Clayton & Co. ("Anderson") during 1982 and 1983. Orscheln billed Anderson under ICC OBTL 400 Item 350, which incorporates ICC MWB 125 Item 578 (shipper load and count notation requirement). Orscheln filed for bankruptcy in 1983 and its auditor, Carriers Traffic Service ("CTS"), again discovered a "notation" problem. When Anderson refused to pay the alleged undercharges, Orscheln filed suit in the district court, which referred the case to the ICC for a "reasonableness" determination. CTS subsequently became Orscheln's assignee in this action by order of the United States Bankruptcy Court for the Eastern District of Missouri. The ICC ruled against CTS and in favor of Anderson. Anderson (along with the ICC) then prevailed in the district court. 691 F.Supp. 151 (N.D.Ill.1988).

*Orscheln Bros. Truck Lines, Inc. v. Cooper Industries* (No. 88–3053) also involves Orscheln and its assignee, CTS. In 1983 Cooper Industries ("Cooper") arranged to have Orscheln transport its air compressors and air compressor parts from Illinois to Tennessee. The parties negotiated a tariff "subject to shipper load, consignee unload," which incorporated by reference

---

**2.** Inman also transported tin plates from Illinois to Tennessee for Boise Cascade. These shipments were originally billed at the lower "converta van" tariff rate, application of which depends upon use of flatbeds or converta van trailers. ICC CSA 240–F Item 6530. However, the shipments were made using non-qualifying equipment. The ICC refused to allow application of the lower tariff rate in the absence of substantial compliance with the tariff requirements. It ruled that Inman's retroactive imposition of a higher tariff rate was reasonable—especially in light of Boise Cascade's inability to demonstrate that the lower rate had actually been negotiated by the parties. Boise Cascade apparently conceded liability for these undercharges in the district court, and does not raise this issue on appeal.

the notation requirement of MWB 125 Item 578. Once again CTS and Orscheln attempted to collect undercharges, and once again the ICC ruled that retroactive application of the notation requirement was unreasonable. In the district court, Judge Conlon granted summary judgment to Cooper and the ICC.

## II.

The appellants ("Carrier Interests") essentially raise two issues on appeal: (1) Did the ICC err in ruling that application of the notation requirement to retroactively raise the tariff rate was unreasonable in these cases? and (2) Did the ICC err in relying upon industry custom in reaching its decisions?

We follow the standards of review delimited by the Administrative Procedure Act, which permit us to

hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

.    .    .    .    .

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

.    .    .    .    .

(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise re-

viewed on the record of an agency hearing provided by statute....

5 U.S.C. § 706(2). *See Simmons v. I.C.C.,* 871 F.2d 702, 705 (7th Cir.1989); *Central States Enters., Inc. v. I.C.C.,* 780 F.2d 664, 673–74 (7th Cir.1985).[3] These standards require that we grant deference to the ICC's expertise and discretion, but "this deference is not intended to shield the agency's action 'from a thorough, probing, in-depth review.'" *Illinois v. United States,* 666 F.2d 1066, 1073 (7th Cir.1981) (quoting *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 415, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971)); *see also NLRB v. Brown,* 380 U.S. 278, 291–92, 85 S.Ct. 980, 988, 13 L.Ed.2d 839 (1965). With this in mind, we review the claims raised by the Carrier Interests.

## A.

██ As this court explained in *Western Transportation Co. v. Wilson and Co., Inc.,* 682 F.2d 1227 (7th Cir.1982), it is within the ICC's authority to declare application of a notation requirement unreasonable in particular cases—indeed, the ICC has responsibility to take "appropriate action" to ensure that tariffs are reasonable. *Id.* at 1231 (citing 49 U.S.C. §§ 10704(a), 11701). We stress that this particular case does not involve a challenge to the reasonableness of the notation requirement *on its face;* rather, it is a challenge to the reasonableness of the requirement *as applied* in these particular cases.[4] Thus our review,

---

**3.** The district court in *Inman* appears to have applied not only the "arbitrary and capricious" standard but also the "substantial evidence" standard. No. 83 C 8968, mem. op. at 4 (citing "substantial evidence" provision), *id.* at 11 (concluding ICC decision was neither arbitrary and capricious nor "unsupported by the evidence"). In *Anderson, Clayton* the district court concluded that the decision was not arbitrary and capricious or "unsupported by law." No. 85 C 8639, mem. op. at 4. In *Cooper* the court quite clearly reviewed under both the "arbitrary and capricious" and "substantial evidence" standards. All three district court opinions cite to 49 U.S.C. section 10701, which does not specifically require a hearing on the record. However, section 10704(a) provides for a "full hearing" when the ICC is deciding whether "a rate charged or collected by a carrier" or "a classification, rule, or practice of that carrier, does or will violate"

the provisions of the Act. The three proceedings in this case were "on the record" and more appropriately viewed as adjudications than as rate-making procedures. *See* 5 U.S.C. § 706(2)(E). On appeal no party has disputed the district court's application of the "substantial evidence" standard, which in any case would not have changed the result reached here. We review the ICC's decision to determine whether it was arbitrary and capricious, in accordance with law and supported by substantial evidence.

**4.** We thus do not read our precedent in *Western Transportation* as inapplicable to cases where tariffs are challenged "as applied." *Cf. Farley Transp. Co. v. Santa Fe Trail Transp. Co.,* 778 F.2d 1365, 1371 (9th Cir.1985) (interpreting *Western Transportation* as applicable only in challenges to reasonableness of tariff "on its

and that of the ICC, is confined to the particular situations involved in these cases, and does not address the validity of the notation requirement on its face. Our review is further limited to situations in which the *ICC* has already made a prior determination as to reasonableness in a specific case; our own authority to make such a determination is a quite different matter, as we indicated in *Western Transportation*.

In *Inman*, the ICC found that retroactive application of the notation requirement would be unreasonable under the particular circumstances of the case. Although recognizing that notation or endorsement requirements must generally be strictly observed, the ICC noted that it has for many years declared application of such requirements unreasonable in cases in which the requirement "serves no purpose, because it has no bearing on the nature of the commodity or the service performed (*i.e.*, the carrier performs no additional service because of the absence of the endorsement), and it is technical rather than substantive." ICC Decision No. MC–C–10928 at 6 (Aug. 12, 1987). After examining the evidence, the ICC found that in this case Boise Cascade had actually loaded and counted the shipments at issue, "[b]ased on the practice in the industry, the testimony of the parties, and the tariff rule." *Id.* at 7. Because Boise Cascade had substantially complied with the tariff, the ICC concluded that

> shipper and carrier each received the benefit for which it bargained. The shipper obtained service at what it considered an affordable price, and the carrier obtained needed traffic. The rate reflected the fact that Boise relieved Inman of loading and counting duties. On the issue that the notation was required to shift the burden of proof to the shipper if a loss and damage claim were filed, defendants have presented no evidence of a claim being filed or additional insurance obtained by Inman because a notation was not made. Under these circumstances, the notation would serve no purpose, and requiring it in order for Boise to receive the reduced rate would be unreasonable.

*Id.*

In *Anderson, Clayton*, the ICC similarly found that "[t]he evidence reveals that

---

face" and not in challenges to reasonableness of tariff "as applied"). To the contrary, *Western Transportation* quite clearly states that the result of any ICC ruling in that case would be to "hold that the notation requirement was unreasonable *as applied to Wilson*," and further notes that "the same requirement, in the same tariff" had already been ruled unreasonable by the ICC in an earlier case. *Id.* at 1231–32 (emphasis added). There would be little sense in repeatedly sending cases back to the ICC to have the same requirement declared unreasonable on its face; the point of the procedure is to obtain a ruling from the ICC regarding the reasonableness of the requirement as applied in particular cases. *Western Transportation* also specifically follows the approach adopted in an earlier case, *Iowa Beef Processors, Inc. v. Western Transportation Co.*, in which the ICC took care to limit its reasonableness finding to the particular facts of that case. ICC Decision No. 32521F at 3 (Sept. 14, 1981) (applying *Standard Brands* analysis under which ICC may rule that "shipper is bound by [tariff] provision," but may yet find "on the particular facts that to apply such a provision would be unreasonable"); *see also Orscheln Bros. Truck Lines, Inc. v. Zenith Electric Corp.*, 708 F.Supp. 845 (N.D.Ill.1988). Like the Eleventh Circuit in *Seaboard System R.R., Inc. v. United States*, 794 F.2d 635 (11th Cir.1986), this circuit in *Western Transportation* recognized the ICC's authority to make reasonableness determinations in particular cases. The Supreme Court has stressed that assessments of "the reasonableness of [a] tariff as applied" are generally "initially matters for the Commission's determination":

> [W]here words in a tariff are used in a peculiar or technical sense, and where extrinsic evidence is necessary to determine their meaning or proper application, so that "the enquiry is essentially one of fact and of discretion in technical matters," then the issue of tariff application must first go to the Commission.

*United States v. Western Pac. R.R. Co.*, 352 U.S. 59, 66, 70, 77 S.Ct. 161, 166, 168, 1 L.Ed.2d 126 (1956). While the facts of *Western Pacific* involved construction of a tariff as well as assessment of its reasonableness as applied, and while cost-allocation was the focus of the determination in that case, the language of *Western Pacific* does not suggest that its holding is confined narrowly to those facts; rather, the case gives somewhat broader guidance. And where the kind of particularist, fact-bound inquiry involved in the case before us is required, *Western Pacific* suggests that appropriate deference is due the ICC's determination.

complainants did in fact load and count the involved shipments." ICC Decision No. MC–C–10995 at 3 (Aug. 25, 1987). In language virtually identical to that used in *Inman,* the ICC ruled that applying the higher tariff would be unreasonable because in these retrospective circumstances the notation requirement would "serve no purpose." *Id.* at 5. This was particularly the case because CTS had presented no evidence that a claim had been filed (or that Orscheln had obtained additional insurance to protect itself against potential claims upon discovering that the notation was not made).

In *Cooper Industries,* there was no need for the ICC to find that Cooper had performed the loading, counting and unloading, because this fact was apparently not contested. ICC Decision No. MC–C–10989 at 2 (Feb. 19, 1987). The ICC observed that in this case the shipper and carrier had obtained the benefits for which they bargained, and that retroactive application of the notation requirement would serve no purpose in light of the fact that no claim had been filed or additional insurance obtained. After ruling that application of the higher rate at this point in the proceedings would be unreasonable, the ICC additionally noted that "waiving undercharges here would be unlikely to encourage ... discriminatory practices" (because there was no evidence that the carrier intentionally undercharged the shipper here).

In all three cases, the decisions of the ICC were supported by substantial evidence and were neither arbitrary nor capricious. The Carrier Interests press again, as they did before the ICC and in the district court, their argument that retroactive use of the notation requirement to raise the tariff rate is reasonable because the notation would have shifted the burden of proof from the carrier to the shipper in any subsequent damages claims. It is the

carriers' contention that because they did not have the benefit of this allocated burden at the time of the shipment or thereafter, they deserve to be compensated for the risk that they unknowingly bore. However, the question before the ICC was not whether application of the tariff would be proper had the Carrier Interests actually had to bear a burden properly shouldered by the shippers. The question was rather whether *retroactive* application of the tariff would be reasonable under the particular circumstances of this case, which include the fact that the Carrier Interests never actually carried a burden of proof they had bargained to be relieved of. The carriers have provided no extra services by virtue of the missing notations. The presence or absence of the notations is merely a technical question, and makes no substantive difference in the retrospective consideration involved here. The ICC's decision that it would not be reasonable to apply the tariff in these circumstances was well-grounded and carefully reasoned, and satisfied both the "arbitrary and capricious" and "substantial evidence" tests.[5]

The Carrier Interests also argue that the ICC's determination is inconsistent with its own precedent. It is true that there are numerous cases in which both the ICC and the courts have insisted upon strict adherence to the rates in published tariffs, in compliance with the "filed rate" doctrine laid down by Congress: "Th[e] carrier may not charge or receive a different compensation for that transportation or service than the rate specified in the tariff." 49 U.S.C. § 10761(a). The filed rate doctrine reflected a strong Congressional policy of discouraging "discrimination" by carriers, which sometimes secretly departed from filed rates to give big shippers preferential rates. *See* S.Rep. No. 46, 49th Cong., 1st Sess. 179–200 (1886) ("The posting or publi-

---

5. The Carrier Interests make an argument, bordering on the frivolous, that "[t]o declare the notation requirement unreasonable would contravene a law of Congress." Brief of Appellants at 30. The language to which appellants point in the Federal Bill of Lading Act merely states that if the *carrier* inserts in the bill of lading the words "Shipper's weight, load, and count"—and

if it turns out to be the case that shipper did actually load and count—the carrier is then absolved of liability for damage caused by improper loading and so forth. At the risk of belaboring the obvious, we do not here deal with the liability of the carriers for any damages and so there is no remotely possible conflict entailed here.

cation of rates, to be a preventive of unjust discrimination, must mean that the railroads shall be operated under a system of fixed rates ... and any deviation therefrom should be declared unlawful"); *see also* Dempsey, *Rate Regulation and Antitrust Immunity in Transportation: The Genesis and Evolution of this Endangered Species*, 32 Am.U.L.Rev. 335, 338–41, 347–48 (1983). The Supreme Court has strictly enforced this policy:

> Under the Interstate Commerce Act, the rate of the carrier duly filed is the only lawful charge. Deviation from it is not permitted upon any pretext. Shippers and travelers are charged with notice of it, and they as well as the carrier must abide by it, unless it is found by the Commission to be unreasonable. Ignorance or misquotation of rates is not an excuse for paying or charging either less or more than the rate filed. This rule is undeniably strict, and it obviously may work hardship in some cases, but it embodies the policy which has been adopted by Congress in the regulation of interstate commerce in order to prevent unjust discrimination.

*Louisville & Nashville R.R. Co. v. Maxwell*, 237 U.S. 94, 97, 35 S.Ct. 494, 495, 59 L.Ed. 853 (1915); *see also Southern Pacific Transp. Co. v. Commercial Metals Co.*, 456 U.S. 336, 352, 102 S.Ct. 1815, 1825, 72 L.Ed.2d 114 (1982) (equities of case insufficient to overcome filed rate doctrine; remedies "best left to the ICC"); *Louisville & Nashville R.R. Co. v. Central Iron & Coal Co.*, 265 U.S. 59, 65, 44 S.Ct. 441, 442, 68 L.Ed. 900 (1924) (tariff rate "fixed by law" and not to be reduced); *Boston & M.R. Co. v. Hooker*, 233 U.S. 97, 112–13, 34 S.Ct. 526, 528–29, 58 L.Ed. 868 (1914) (purpose of act was "to have but one rate, open to all alike and from which there could be no departure"); *Armour Packing Co. v. U.S.*, 209 U.S. 56, 81, 28 S.Ct. 428, 435, 52 L.Ed. 681 (1908) (if rates "subject to secret alteration by special agreement," antidiscrimination purpose of statute will fail); *New Haven R.R. Co. v. I.C.C.*, 200 U.S. 361, 391, 26 S.Ct. 272, 277, 50 L.Ed. 515 (1906) (purpose of act is "to secure equality of rates as to all, and to destroy favoritism" through "requiring the publication of tariffs and by prohibiting secret departures from such tariffs, and forbidding rebates, preferences and all other forms of undue discrimination").

There are several established exceptions to this stringent rule. Where tariffs are ambiguous, the ICC and the courts have permitted departures from the filed rates. And, for a number of years, the ICC has exercised its "unreasonable practice" jurisdiction to declare application of filed rates unreasonable. *See Nader v. Allegheny Airlines*, 426 U.S. 290, 304, 96 S.Ct. 1978, 1987, 48 L.Ed.2d 643 (1976) (courts defer to agency where case "raises a question of the validity of a rate or practice included in a tariff filed with an agency"); *cf. I.C.C. v. Atlantic Coast Line R.R. Co.*, 383 U.S. 576, 86 S.Ct. 1000, 16 L.Ed.2d 109 (1966); *Pennsylvania R.R. Co. v. United States*, 363 U.S. 202, 80 S.Ct. 1131, 4 L.Ed.2d 1165 (1960); *United States v. Western Pacific R.R. Co.*, 352 U.S. 59, 77 S.Ct. 161, 1 L.Ed.2d 126 (1956); *Illinois Central R.R. Co. v. I.C.C.*, 206 U.S. 441, 27 S.Ct. 700, 51 L.Ed. 1128 (1907); *Texas & Pacific R.R. Co. v. Abilene Cotton Oil Co.*, 204 U.S. 426, 27 S.Ct. 350, 51 L.Ed. 553 (1907) (discussing ICC's primary jurisdiction in unreasonable practice determinations). Of particular interest in the case before us is the repeated use by the ICC of its "unreasonable practice" jurisdiction to prevent carriers from imposing higher tariffs because of the mere absence of a notation on a bill of lading (where all the other requirements of the tariff have been met). This is not a recent development; in a 1952 case the ICC ruled that, where required notations were absent, the higher tariff actually applied but would not be enforced because enforcement would be unreasonable. *Dulien Steel Prods. Inc. of Illinois v. New York, N.H. & H.R. R.R. Co.*, 287 I.C.C. 386 (1952). Similarly, a number of more recent ICC cases have used the "unreasonable practice" jurisdiction to avoid imposition of higher filed tariffs based solely upon the absence of a requisite notation upon the bills of lading. *See, e.g., Iowa Beef Processors, Inc. v. Western Transporation Co.*,

ICC Decision No. 32521F (Sept. 14, 1981) (applying *Standard Brands* analysis, ruling that "shipper is bound by [notation] requirement, but [finding] on the particular facts that to apply such a provision would be unreasonable"); *Standard Brands, Inc. v. Central R.R. Co. of N.J.*, 350 I.C.C. 555 (1974) (in the circumstances of this case, notation provision "serves no purpose except to create a trap for the unsuspecting shipper"; notation requirement was unreasonable because it had "no bearing on the nature of the commodity being shipped or the service performed").

Similarly, the ICC has refused to permit retroactive collection of undercharges where "[p]enalizing a shipper for the mistake of a carrier [would] be unnecessary and inappropriate to deter discrimination." *Buckeye Cellulose Corp. v. Louisville & Nashville R.R. Co.*, 1 I.C.C.2d 767, 774 (1985).[6] In *Cooper*, the ICC observed:

> Because the notation requirement itself is unreasonable, further discussion of the filed rate doctrine and equitable defenses to its application is unnecessary. Still, we note that, as there is no evidence that the carrier knowingly or intentionally undercharged the shipper, waiving undercharges here would be unlikely to encourage the discriminatory practices that section 10701(a) is intended to prohibit.

ICC Decision No. MC–C–10989 at 5. This is intuitively sensible; the filed rate doctrine was designed to prevent potentially discriminatory favoritism or secret deals. Where the two parties openly agreed upon a rate and substantially complied with the tariff requirements (and particularly where the carrier is attempting to retroactively profit from the shipper's failure to carry out a mere formality), the policy concerns behind the filed rate doctrine are not implicated. In such a situation, permitting the carrier to recover would not deter favoritism or secret deals in any way; it would merely give the carrier a windfall.

The Carrier Interests point in particular to *Winthrop Laboratories Division v. Dorn's Transportation, Inc.*, 325 I.C.C. 654 (1964), as a conflicting ICC precedent. *Winthrop* essentially presents the mirror-image of the cases before us; there the parties originally agreed to and paid higher rates. However, the shipper subsequently discovered that a lower "released-value" rate was available, under which the shipper could pay less in return for releasing the carrier from some of its usual stated liability. The shipper felt that the carrier had a duty to inform shippers of the availability of alternate rates, and consequently filed a complaint with the ICC seeking to have the carrier's failure to inform declared unreasonable. The ICC quite reasonably held that the shipper had a duty to inform itself of the availability of applicable rates.

Strictly speaking, the ruling in *Winthrop* is essentially irrelevant to the situation before us; there is no question here whether the carriers had a duty to inform. However, in an aside, the ICC in *Winthrop* also noted that the shipper had not complied with a prerequisite of the lowered tariff there—a notation indicating that the stated

---

6. In light of ICC precedent dating back to the 1950s, it is difficult to credit the Carrier Interests' characterization of the ICC's exercise of the unreasonable practice jurisdiction in the cases before us as a "radical departure" from prior ICC decisions meriting special explanation under *Atchison, Topeka & Santa Fe R.R. v. Witchita Board of Trade*, 412 U.S. 800, 93 S.Ct. 2367, 37 L.Ed.2d 350 (1973). While the "filed rate" doctrine and the ICC's "unreasonable practice" jurisdiction unquestionably exist in a tension of sorts, it is a tension with which the ICC has dealt for many years. It is true, although appellants do not make this point, that the ICC recently issued a policy statement apparently announcing a changed position regarding equitable defenses to the "filed rate doctrine." *National Indus. Transp. League—Petition to Institute Rulemaking on Negotiated Motor Common Carrier Rates: Ex Parte No. MC–177*, 3 I.C.C.2d 99 (1986). However, the key change announced by MC–177 was the possibility of enforcing unfiled negotiated rates, hitherto barred completely by the filed rate doctrine. We do not read MC–177 as marking any dramatic shift in the ICC's approach to arguably superfluous notation requirements. Since we do not in this case confront an unfiled negotiated rate, we do not reach the issue of the general validity of MC–177.

In any case, the ICC opinions in these cases and in cases like *Standard Brands* and *Buckeye* set forth sufficient reasons to satisfy the requirements of *Atchison*. Cf. *Seaboard System R.R., Inc. v. United States*, 794 F.2d 635, 639 (11th Cir.1986).

liability on the bill of lading had been altered. Requiring conformity with that prerequisite, where the lowered tariff was solely in consideration of reduced liability—and where the only indication that the shipper had agreed to reduced liability would have been the notation on the bills of lading—is an entirely different matter than requiring conformity with the notation requirement in the cases before us. In these cases the shipper paid a lowered tariff in return for loading and counting the goods. The notation requirement was merely a formality providing additional evidence that the shipper had in fact done the loading and counting. In any subsequent damage claim, to be sure, the notation would have aided the carrier in defending against potential liability for damage. But the notation would have been simply a way of demonstrating that the loading and counting had occurred. This indicates the difference between the function of the notation here and the function of the notation in *Winthrop*, where the notation *itself* was a key way (or perhaps the only way) in which the shift in liability required by the tariff would have been accomplished or subsequently demonstrated. The notation in *Winthrop* actually releases the carrier from liability, while the notation in the cases before us merely shifts a burden of proof as to liability. Another distinction is that in *Winthrop* it was the shipper who sought a retroactive change in the tariff rate whereas here it is the carrier; from this perspective, the cases reach similar results in that the ICC refused in both cases to alter the original arrangement and give one party an unbargained-for windfall. Finally, the shippers in this case performed the counting and loading required to qualify for a lower tariff whereas in *Winthrop* the shipper had apparently done nothing to lower the carrier's liability as required in order to qualify for the tariff.[7] Even if *Winthrop* were a stronger case for the Carrier Interests, one past ICC decision would not call into question the ICC's quite consistent line of "unreasonable practice" jurisdiction cases. But, as we have explained, *Winthrop* is eminently distinguishable.

### B.

■ The Carrier Interests' final contention is fairly easily addressed. They assert that the ICC erred in using industry custom to vary the terms of a published tariff rate, citing *Atlantic Coast Line R.R. Co. v. Clinchfield Fuel Co.*, 94 F.Supp. 992 (W.D. S.C.1951). *Atlantic Coast* dealt with a situation in which the parties had for many years made shipments without issuing uniform bills of lading. Under the applicable filed tariff, the defendant consignor was required to execute a section on the face of the bill of lading in order to avoid liability for freight charges. Instead, by mutual agreement, the parties had attached mine cards to the cars when loaded. These cards were not bills of lading and were not executed. The defendant essentially attempted to evade the requirements of the tariff simply by saying that the "long-established course of shipping on mine cards" estopped the plaintiff from insisting upon

---

7. *Winthrop* cites another ICC case in which a notation requirement was strictly enforced, *Embassy Distributing Co., Inc. v. Western Carloading Co.*, 280 I.C.C. 229 (1951). The notation in *Embassy* was a description of the goods accepted for shipment. Depending upon the description the shipper gave to the freight-forwarder, a higher or lower tariff pertained. The shipper did not adequately label one of the shipments, and was charged a higher tariff applicable to other kinds of goods. The ICC approved the higher rate where the shipper had failed to make a proper notation indicating the content of the shipment. Again, this is a quite different situation than the one found in the cases before us. As the ICC observed in *Embassy*, "when the shipment is tendered in packages, the defendant must of necessity depend upon the shipper for a correct description of the commodity shipped." *Id.* at 232. Failing to enforce the notation requirement in those cases would impose a great deal of unbargained-for labor upon the freight-forwarder, who would now have to unpackage every shipment it received in order to accurately determine its contents. As we have noted, the notation requirement in this case does not play a similarly central role. Thus, in reading past ICC decisions regarding notation requirements, it is important to distinguish the functions and relative importance of the notations in each case. That one sort of notation requirement is strictly enforced does not mean that another must be.

compliance with the tariff. Had the court accepted this argument, it would essentially have allowed two parties by agreement to circumvent the tariff requirements—giving the mere fact of their continued practice over the years the power to overcome filed tariff requirements. Leaving aside for the moment the fact that *Atlantic Coast* deals with a custom or course of dealing between two parties (in contrast with the more general "custom in the industry" at issue in the case before us), Judge Aspen has cogently explained to appellants the problem with their argument: "The ICC found application of the higher rate unreasonable not because of industry custom but because of Boise Cascade's actions, as evidenced by industry custom." *Inman,* mem. op. at 10. The ICC did not use evidence of industry custom as its reason for permitting a variation from the filed tariff. Its reason for permitting a variation was that if the shippers had actually performed the loading and unloading, enforcing the notation requirement would serve no purpose. The ICC used "custom or practice in the industry" only when making a distinct factual determination whether the shippers in these particular cases actually performed the loading and counting.

In *Inman* the ICC relied on "practice in the industry, the testimony of the parties, and the tariff rule" to conclude that Boise Cascade actually performed the loading and counting. ICC Decision No. MC–C–10928 at 7 (Aug. 12, 1987). In *Anderson, Clayton,* the ICC found that the shippers had performed the loading and counting, based upon the physical loading requirements (which tended to indicate that the shipper rather than the carrier had performed the loading) and "the evidence regarding rate negotiations." ICC Decision No. MC–C–10995 at 5 (Aug. 25, 1987). In *Cooper Industries,* the ICC stated that the "[d]efendant does not deny that Cooper actually provided the loading, counting, and unloading for all the shipments," but later added that "Cooper loaded, counted and unloaded each shipment in fact, and the evidence is not disputed that it is the general practice with these commodities for the shipper to do so." ICC Decision No. MC–C–10989 at 2, 4–5 (Feb. 19, 1987). In none of these cases did even the factual findings themselves turn directly upon evidence of general custom in the industry. Rather, evidence of general custom supported other indications that the shippers in these cases actually loaded and counted.

The Carrier Interests do not seem to grasp the purpose for which evidence of industry custom was used by the ICC and continue to argue as if industry custom had been used directly to excuse a variation from a published tariff. If the ICC had used industry custom directly to excuse a variation in these cases, it would have had to find evidence that shippers never made notations, and then used *that* evidence of industry custom to excuse the shippers in these cases from the notation requirement. That is the sort of direct use of industry custom that has been frowned upon; saying that "we've always ignored that tariff requirement" has not generally been deemed an adequate excuse for failing to comply. But the ICC allowed no such excuse in this case. Rather, it used industry custom as one of several pieces of evidence from which the ICC could infer that the shippers actually did the loading and counting in these cases. The only way to attack the ICC's reliance on industry custom here would be to contest its *factual* conclusion that the shippers actually loaded and counted.

In sum, the ICC determined that *if* the actual loading and counting had been performed, strict enforcement of the notation requirement would be unreasonable—based not upon custom of the industry, but upon its own analysis of the function and importance of the notation requirement in these cases. Thus its decision to allow a variation from the plain language of the tariff provisions did not rest upon industry custom. However, the ICC did need to ascertain whether the loading and counting had actually been performed, and that separate factual determination relied upon a number of considerations, including custom of the industry. We see no reason why the ICC could not consider industry custom, as one

of several factors, in reaching its factual findings in these cases.

### III.

We reiterate that our holding here should be construed narrowly. In this case we merely uphold the ICC's exercise of its "unreasonable practice" jurisdiction to invalidate the retroactive application of a higher tariff rate in the circumstances of these cases. The judgments of the district court in these cases are

AFFIRMED.