# MAISLIN INDUSTRIES, U. S., INC., ET AL. *v.* PRIMARY STEEL, INC., ET AL.

No. 89–624.   Argued April 16, 1990—Decided June 21, 1990

BRENNAN, J., delivered the opinion of the Court, in which WHITE, MARSHALL, BLACKMUN, O'CONNOR, SCALIA, and KENNEDY, JJ., joined. SCALIA, J., filed a concurring opinion, *post*, p. 136. STEVENS, J., filed a dissenting opinion, in which REHNQUIST, C. J., joined, *post*, p. 138.

*Thomas M. Auchincloss, Jr.*, argued the cause for petitioners. With him on the briefs were *Brian L. Troiano* and *David G. Sperry*.

*Deputy Solicitor General Merrill* argued the cause for respondents. With him on the brief for the Interstate Commerce Commission, respondent under this Court's Rule 12.4, were *Solicitor General Starr, Michael R. Dreeben, Robert S. Burk*, and *Ellen D. Hanson. Henry M. Wick, Jr., Charles J. Streiff*, and *Edward E. Schmitt* filed a brief for respondent Primary Steel, Inc.*

---

*Briefs of *amici curiae* urging reversal were filed for McLean Trucking Co. et al. by *Paul O. Taylor*; for Oneida Motor Freight, Inc., by *Joseph L. Steinfeld, Jr., Robert B. Walker*, and *Miles L. Kavaller*; for Overland Express, Inc., by *James A. Knauer* and *James M. Carr*; and for Robert Yaquinto, Jr., by *Louis J. Wade*.

Briefs of *amici curiae* urging affirmance were filed for the National-American Wholesale Grocers' Association et al. by *William H. Borghesani, Jr.*, and *Martin W. Bercovici*; for Shippers National Freight Claim Council, Inc., by *William J. Augello* and *Fritz R. Kahn*; for the National Industrial Transportation League et al. by *Frederic L. Wood, Nicholas J. DiMichael, Richard D. Fortin, Jan S. Amundson, Quentin Riegel*, and *Daniel J. Sweeney*; and for Supreme Beef Processors, Inc., by *John W. Bryant*.

JUSTICE BRENNAN delivered the opinion of the Court.

Under the Interstate Commerce Act (Act), 49 U. S. C. § 10101 *et seq.* (1982 ed.), motor common carriers must file their rates with the Interstate Commerce Commission (ICC or Commission), and both carriers and shippers must adhere to these rates. This case requires us to determine the validity of a policy recently adopted by the ICC that relieves a shipper of the obligation of paying the filed rate when the shipper and carrier have privately negotiated a lower rate. We hold that this policy is inconsistent with the Act.

## I

### A

The ICC regulates interstate transportation by motor common carriers to ensure that rates are both reasonable and nondiscriminatory. See 49 U. S. C. §§ 10101(a), 10701(a), 10741(b) (1982 ed.). The Act provides that a "common carrier . . . may not subject a person, place, port, or type of traffic to unreasonable discrimination." § 10741. In addition, the Act states that "[a] rate . . . , classification, rule, or practice related to transportation or service . . . must be reasonable." § 10701(a).[1] The ICC has primary responsibility for determining whether a rate or practice is reasonable. See *Texas & Pacific R. Co.* v. *Abilene Cotton Oil Co.*, 204 U. S. 426, 440–442 (1907). The Commission may investigate the reasonableness of a rate "on its own initiative or on complaint." § 11701(a). When the Commission determines that a rate or practice violates the statute, it "shall prescribe the rate . . . or practice to be followed." § 10704(b)(1). Moreover, motor common carriers are liable "for damages resulting from the imposition of rates for transportation or service

[1] The Act states that when reviewing the reasonableness of a carrier's rates, the Commission "shall authorize revenue levels that are adequate under honest, economical, and efficient management to cover total operating expenses . . . plus a reasonable profit." 49 U. S. C. § 10701(e) (1982 ed.).

the Commission finds to be in violation" of the Act. 49 U. S. C. § 11705(b)(3) (1982 ed., Supp. V).

The Act requires a motor common carrier to "publish and file with the Commission tariffs containing the rates for transportation it may provide." 49 U. S. C. § 10762(a)(1) (1982 ed.). The Act also specifically prohibits a carrier from providing services at any rate other than the filed (also known as the tariff) rate:

> "Except as provided in this subtitle, a carrier providing transportation or service subject to the jurisdiction of the Interstate Commerce Commission . . . shall provide that transportation or service only if the rate for the transportation or service is contained in a tariff that is in effect under this subchapter. That carrier may not charge or receive a different compensation for that transportation or service than the rate specified in the tariff whether by returning a part of that rate to a person, giving a person a privilege, allowing the use of a facility that affects the value of that transportation or service, or another device." § 10761(a).

Deviation from the filed rate may result in the imposition of civil or criminal sanctions on the carrier or shipper. See §§ 11902–11904.[2]

As the Court has frequently stated, the statute does not permit either a shipper's ignorance or the carrier's misquotation of the applicable rate to serve as a defense to the collection of the filed rate. See *Southern Pacific Transp. Co.* v.

---

[2] Section 11902 provides that a shipper who knowingly receives a rebate or offset against the filed rate is liable to the Government for a civil penalty in an amount equal to three times the rebate. Section 11903(a) states that any person who "knowingly offers, grants, gives, solicits, accepts, or receives" service at less than the filed rate "shall be fined at least $1,000 but not more than $20,000, imprisoned for not more than 2 years, or both." A carrier who willfully fails to file and publish its tariffs is subject to the same penalty. See § 11903(b); see also § 11904 (corporate liability).

*Commercial Metals Co.*, 456 U. S. 336, 352 (1982); *Louisville & Nashville R. Co.* v. *Maxwell*, 237 U. S. 94, 97 (1915). In 1986, however, the ICC concluded that changes in the motor carrier industry "clearly warrant a tempering of the former harsh rule of adhering to the tariff rate in virtually all cases." *NITL—Petition to Institute Rulemaking on Negotiated Motor Common Carrier Rates*, 3 I. C. C. 2d 99, 106 (1986) *(Negotiated Rates I)*. Under the new policy, when cases are referred to the Commission, it "decid[es] if the collection of undercharges would be an unreasonable practice." *Id.*, at 100.

In *Negotiated Rates I*, the Commission adverted to a growing trend in the motor carrier industry whereby carriers and shippers negotiate rates lower than those on file with the ICC, and the shippers are billed for and remit payment at the negotiated rate. In many instances, however, the negotiated rate is never filed with the ICC. In some of those cases, the carrier subsequently files for bankruptcy and the trustee bills the shipper for the difference between the tariff rate and the negotiated rate, arguing that § 10761 compels the collection of the filed rather than negotiated rate. *Id.*, at 99. The Commission concluded that, under such circumstances, "it could be fundamentally unfair not to consider a shipper's equitable defenses to a claim for undercharges." *Id.*, at 103. The Commission reasoned that the passage of the Motor Carrier Act of 1980, which significantly deregulated the motor carrier industry, justified the change in policy, for the new competitive atmosphere made strict application of § 10761 unnecessary to deter discrimination. 3 I. C. C. 2d, at 106. Moreover, the Commission asserted that it had authority under § 10701 to determine whether the collection of the undercharge in a particular case would constitute an unreasonable practice. *Id.*, at 103.[3]

---

[3] The Commission stated that its new policy did not "abrogate Section 10761. Rather, we emphasize that carriers must continue to charge the tariff rate, as provided in the statute. The issue here is simply whether

The ICC clarified its new policy in *NITL—Petition to Institute Rulemaking on Negotiated Motor Common Carrier Rates*, 5 I. C. C. 2d 623 (1989) *(Negotiated Rates II)*. The Commission explained that its policy did not recognize "equitable defenses" but rather applied the "affirmative statutory requiremen[t] and obligatio[n]" of § 10701 that a carrier's practices be reasonable. *Id.*, at 631, n. 18.[4] "[T]he Commission is finding to be an unreasonable practice . . . a course of conduct consisting of: (1) negotiating a rate; (2) agreeing to a rate that the shipper reasonably relies upon as being lawfully filed; (3) failing, either willfully or otherwise, to publish the rate; (4) billing and accepting payment at the negotiated rate for (sometimes) numerous shipments; and (5) then demanding additional payment at higher rates." *Id.*, at 628, n. 11.

B

This case involves the application of the Commission's new *Negotiated Rates* policy. It arises from an action by petitioner Maislin Industries, U. S., Inc. (Maislin), to recover freight undercharges for 1,081 interstate shipments per-

we have the authority to consider all the circumstances surrounding an undercharge suit." *NITL—Petition to Institute Rulemaking on Negotiated Motor Common Carrier Rates*, 3 I. C. C. 2d 99, 103 (1986) (citations omitted). The Commission rejected a proposal by the National Industrial Transportation League (NITL) that would have declared the negotiated rate to be the maximum reasonable rate. The Commission concluded that the proposal conflicted with § 10761 because it created a *"per se* determination that, as a matter of law, the negotiated rate would apply." *Id.*, at 102.

[4] The Commission stated: "[O]ur *Negotiated Rates* policy does not represent a relaxed interpretation of § 10761, but rather a separate determination under § 10701. But even if it were viewed as a reinterpretation of a previously strict construction of § 10761, it would be . . . well within this agency's authority (and indeed duty) to reinterpret the Interstate Commerce Act, based on upon experience gained and changing circumstances." *NITL—Petition to Institute Rulemaking on Negotiated Motor Common Carrier Rates*, 5 I. C. C. 2d 623, 631 (1989) (citing *American Trucking Assns., Inc.* v. *Atchison T. & S. F. R. Co.*, 387 U. S. 397, 416 (1967)).

formed for a shipper, respondent Primary Steel (Primary), by petitioner's subsidiary, Quinn Freight Lines (Quinn). From 1981 to 1983, Quinn, a motor common carrier certificated by the ICC, privately negotiated rates with Primary that were lower than Quinn's rates then on file with the ICC. Quinn never filed the negotiated rates with the ICC.

In 1983, Maislin filed for bankruptcy, and a postpetition audit of its accounts revealed undercharges of $187,923.36 resulting from billing Primary at the negotiated, rather than filed, rates. The agents of the bankrupt estate, pursuant to the authorization of the Bankruptcy Court, issued balance due bills to Primary for these undercharges. When Primary refused to pay the amounts demanded, the estate brought suit in the United States District Court for the Western District of Missouri under 49 U. S. C. § 11706(a) (1982 ed.)[5] for the difference between the filed rates and the negotiated rates.

In its answer, Primary alleged that since the parties had negotiated lower rates, rebilling at the tariff rates would constitute an unreasonable practice in violation of § 10701; that the tariff rates themselves were not "reasonable" within the meaning of § 10701; and that the asserted tariff rates were otherwise inapplicable to the shipments at issue. The District Court, finding these matters to be within the primary jurisdiction of the ICC, stayed the proceeding at Primary's request and referred the case to the Commission. App. 6–8.

The ICC ruled in Primary's favor, rejecting Maislin's argument that the Commission lacked the statutory power to release a shipper from liability for such undercharges. Relying on *Negotiated Rates I*, the ICC reiterated that § 10701 authorized it to "consider all the circumstances surrounding an

---

[5] Section 11706(a) provides:

"A common carrier providing transportation or service subject to the jurisdiction of the Interstate Commerce Commission . . . must begin a civil action to recover charges for transportation or service provided by the carrier within 3 years after the claim accrues."

undercharge suit" to determine whether collection of the filed rate would constitute an unreasonable practice. App. to Pet. for Cert. 35a. In the Commission's view, its role was "to undertake an analysis of whether a negotiated but unpublished rate existed, the circumstances surrounding assessment of the tariff rate, and any other pertinent facts." *Id.*, at 36a. With respect to the instant controversy, the ICC concluded that Quinn and Primary had negotiated rates other than the tariff rates[6] and that Primary had relied on Quinn to file the rates with the ICC.[7] "Primary reasonably believed that the amounts quoted and billed by Quinn were the correct total charges for the transportation services it performed, that the amounts were reached as the result of negotiations between Primary and Quinn, and that, since full pay-

---

[6] See App. to Pet. for Cert. 36a–38a. The Commission relied primarily on two "rate sheets" to find that negotiated rates existed. According to the Commission, a three-page rate sheet prepared by Primary in 1981 demonstrated that Quinn, through its agent James McGowan, had negotiated a five percent across-the-board increase in rates above those in Quinn's tariff on file with the ICC. Sometime in 1982, when Primary notified Quinn that it would need relief from the rates in order to continue using Quinn, the parties orally negotiated a decrease in the rates. Primary prepared a new rate sheet which was sent to all the relevant individuals. Subsequently, whenever rates were needed for destinations other than those shown on the rate sheet, McGowan would set a new rate based on the mileage involved. The ICC concluded that "there is evidence of offers, acceptances, and approvals by the involved parties" before each of the shipments in question. *Id.*, at 36a; see also *id.*, at 38a.

[7] See *id.*, at 43a. This finding was based on the fact that McGowan represented that his superiors had approved the rates on the written rate sheets. See *id.*, at 40a. The Commission noted that Primary's representative was never given an actual tariff documenting that the agreed-upon rates had been filed with the ICC and that Primary's representative had no training with respect to tariffs, but the Commission concluded that the representative "understood that Quinn would do whatever was necessary to implement the agreed upon rates." *Id.*, at 32a. The Commission specifically found that "[w]hile Quinn may not have taken appropriate steps to legalize the quoted rates, it has not been demonstrated that this occurred as a result of any intent to engage in unlawful conduct." *Id.*, at 42a.

ment was made by [Primary]," Maislin was not entitled to recover the filed rates. *Id.*, at 43a.

The case returned to the District Court where both parties moved for summary judgment. The court granted summary judgment for Primary, rejecting Maislin's argument that the ICC's new policy was, in effect, an impermissible recognition of equitable defenses to the application of the filed rate. The District Court concluded that the ICC's policy of determining case by case whether the collection of undercharges would be an unreasonable practice under § 10701 was based on a permissible construction of the Act. 705 F. Supp. 1401, 1405–1406 (1988). The court also determined that the ICC's finding that Maislin had engaged in an unreasonable practice was supported by substantial evidence. *Id.*, at 1406–1407.

The Court of Appeals for the Eighth Circuit affirmed, agreeing that the approach taken by the ICC was consistent with the Act. The court reasoned that "[s]ection 10761(a), which mandates the collection of tariff rates, is only part of an overall regulatory scheme administered by the ICC, and there is no provision in the [Act] elevating this section over section 10701, which requires that tariff rates be reasonable." 879 F. 2d 400, 405 (1989). The court concluded: "[T]he proper authority to harmonize these competing provisions is the ICC. . . . The approach taken by the ICC does not abolish the filed rate doctrine, but merely allows the ICC to consider all of the circumstances, including equitable defenses, to determine if strict adherence to the filed rate doctrine would constitute an unreasonable practice." *Ibid.* (citation omitted). Because the Courts of Appeals have disagreed on the important issue whether the ICC's *Negotiated Rates* policy is consistent with the Act,* we granted certiorari. 493 U. S. 1041 (1990).

---

*Compare *In re Caravan Refrigerated Cargo, Inc. (Supreme Beef Processors)*, 864 F. 2d 388 (CA5 1989), with *Delta Traffic Service, Inc. v. Transtop, Inc.*, 902 F. 2d 101 (CA1 1990); *Orscheln Bros. Truck Lines, Inc. v. Zenith Electric Corp.*, 899 F. 2d 642 (CA7 1990); *West Coast Truck*

## II

The Act requires a motor common carrier to publish its rates in a tariff filed with the Commission. 49 U. S. C. § 10762 (1982 ed.). This Court has long understood that the filed rate governs the legal relationship between shipper and carrier. In *Keogh* v. *Chicago & Northwestern R. Co.*, 260 U. S. 156, 163 (1922), the Court explained:

> "The legal rights of shipper as against carrier in respect to a rate are measured by the published tariff. Unless and until suspended or set aside, this rate is made, for all purposes, the legal rate, as between carrier and shipper. The rights as defined by the tariff cannot be varied or enlarged by either contract or tort of the carrier. . . . This stringent rule prevails, because otherwise the paramount purpose of Congress—prevention of unjust discrimination—might be defeated." (Citations omitted.)

See *Square D Co.* v. *Niagara Frontier Tariff Bureau, Inc.*, 476 U. S. 409, 415–417 (1986); *Abilene Cotton Oil*, 204 U. S., at 439; *Texas & Pacific R. Co.* v. *Mugg*, 202 U. S. 242, 245 (1906); *Gulf, C. & S. F. R. Co.* v. *Hefley*, 158 U. S. 98, 101 (1895). The duty to file rates with the Commission, see § 10762, and the obligation to charge only those rates, see § 10761, have always been considered essential to preventing price discrimination and stabilizing rates. "In order to render rates definite and certain, and to prevent discrimination and other abuses, the statute require[s] the filing and publishing of tariffs specifying the rates adopted by the carrier, and ma[kes] these the *legal* rates, that is, those which must be charged to all shippers alike." *Arizona Grocery Co.* v. *Atchison, T. & S. F. R. Co.*, 284 U. S. 370, 384 (1932).

Given the close interplay between the duties imposed by §§ 10761–10762 and the statutory prohibition on discrimina-

*Lines, Inc.* v. *Weyerhaeuser Co.*, 893 F. 2d 1016 (CA9 1990); *Delta Traffic Service, Inc.* v. *Appco Paper & Plastics Corp.*, 893 F. 2d 472 (CA2 1990).

tion, see § 10741, this Court has read the statute to create strict filed rate requirements and to forbid equitable defenses to collection of the filed tariff. See *Mugg, supra,* at 245; *Hefley, supra,* at 101. The classic statement of the "filed rate doctrine," as it has come to be known, is explained in *Louisville & Nashville R. Co.* v. *Maxwell,* 237 U. S. 94 (1915). In that case, the Court held that a passenger who purchased a train ticket at a rate misquoted by the ticket agent did not have a defense against the subsequent collection of the higher tariff rate by the railroad.

> "Under the Interstate Commerce Act, the rate of the carrier duly filed is the only lawful charge. Deviation from it is not permitted upon any pretext. Shippers and travelers are charged with notice of it, and they as well as the carrier must abide by it, unless it is found by the Commission to be unreasonable. Ignorance or misquotation of rates is not an excuse for paying or charging either less or more than the rate filed. This rule is undeniably strict and it obviously may work hardship in some cases, but it embodies the policy which has been adopted by Congress in the regulation of interstate commerce in order to prevent unjust discrimination." *Id.,* at 97.[9]

This rigid approach was deemed necessary to prevent carriers from intentionally "misquoting" rates to shippers as a means of offering them rebates or discounts. See S. Rep.

---

[9] See also *Louisville & Nashville R. Co.* v. *Central Iron & Coal Co.,* 265 U. S. 59, 65 (1924) ("No contract of the carrier could reduce the amount legally payable; or release from liability a shipper who had assumed an obligation to pay the charges. Nor could any act or omission of the carrier (except the running of the statute of limitations) estop or preclude it from enforcing payment of the full amount by a person liable therefor"); *Kansas City Southern R. Co.* v. *Carl,* 227 U. S. 639, 653 (1913) ("Neither the intentional nor accidental misstatement of the applicable published rate will bind the carrier or shipper. The lawful rate is that which the carrier must exact and that which the shipper must pay. The shipper's knowledge of the lawful rate is conclusively presumed").

No. 46, 49th Cong., 1st Sess., 181, 188–190, 198–200 (1886). As the Commission itself found: "[P]ast experience shows that billing clerks and other agents of carriers might easily become experts in the making of errors and mistakes in the quotation of rates to favored shippers, while other shippers, less fortunate in their relations with carriers and whose traffic is less important, would be compelled to pay the higher published rates." *Poor* v. *Chicago, B. & Q. R. Co.*, 12 I. C. C. 418, 421–422 (1907); see also *Western Transp. Co.* v. *Wilson & Co.*, 682 F. 2d 1227, 1230–1231 (CA7 1982). Despite the harsh effects of the filed rate doctrine, we have consistently adhered to it. See, *e. g.*, *Thurston Motor Lines, Inc.* v. *Jordan K. Rand, Ltd.*, 460 U. S. 533, 535 (1983); *Southern Pacific Transp. Co.*, 456 U. S., at 343–344; *Baldwin* v. *Scott County Milling Co.*, 307 U. S. 478, 484–485 (1939); *Louisville & Nashville R. Co.* v. *Central Iron & Coal Co.*, 265 U. S. 59, 65 (1924).

The filed rate doctrine, however, contains an important caveat: The filed rate is not enforceable if the ICC finds the rate to be unreasonable. See *Maxwell, supra*, at 97 (filed rate applies *"unless it is found by the Commission to be unreasonable"*) (emphasis added); see also *Keogh, supra*, at 163 ("The legal rights of shipper as against carrier in respect to a rate are measured by the published tariff. *Unless and until suspended or set aside*, this rate is made, for all purposes, the legal rate") (emphasis added). The filed rate doctrine, therefore, follows from the requirement that only filed rates be collected, as commanded by §§ 10761 and 10762, the requirement that rates not be discriminatory, see § 10741, and the requirement of § 10701 that carriers adopt reasonable rates and practices. As we explained in *Arizona Grocery, supra*, although the filed rate is the *legal* rate, the Act

> "did not abrogate, but [rather] expressly affirmed, the common-law duty to charge no more than a reasonable rate . . . . In other words, the legal rate was not made by the statute a lawful rate—it was lawful only if it was

reasonable. Under [the Act] the shipper was bound to pay the legal rate; but if he could show that it was unreasonable he might recover reparation.

"The Act altered the common law by lodging in the Commission the power theretofore exercised by courts, of determining the reasonableness of a published rate. If the finding on this question was against the carrier, reparation was to be awarded the shipper, and only the enforcement of the award was relegated to the courts." *Id.*, at 384–385 (footnote omitted).

In the instant case, the Commission did not find that the rates were unreasonable,[10] but rather concluded that the carrier had engaged in an unreasonable practice in violation of § 10701 that should preclude it from collecting the filed rates. The Commission argues that under the filed rate doctrine, a finding that the carrier engaged in an unreasonable practice should, like a finding that the filed rate is unreasonable, disentitle the carrier to collection of the filed rate. We have never held that a carrier's unreasonable practice justifies departure from the filed tariff schedule.[11] But we need not

---

[10] The ICC did not determine whether the tariff rates were unreasonable even though primary respondent requested such a determination. We therefore must assume, for purposes of our decision today, that the rates were reasonable. The issue of the reasonableness of the tariff rates is open for exploration on remand.

[11] None of our cases involving a determination by the ICC that the carrier engaged in an unreasonable practice have required departure from the filed tariff schedule altogether; instead, they have required merely the application of a different filed tariff. For example, in *Hewitt-Robins Inc. v. Eastern Freight-Ways, Inc.*, 371 U. S. 84, 86 (1962), the Commission's finding that a carrier had engaged in an unreasonable practice by routing intrastate shipments over interstate routes required only the application of a different filed rate, *i. e.*, the intrastate rates, rather than departure from the tariff schedule entirely. See also *Adams* v. *Mills*, 286 U. S. 397, 412 (1932) (reparations ordered constituted difference between one filed rate and another). Likewise, the cases in which the ICC has determined that a carrier engaged in an unreasonable practice by requiring a certain notation attached to the bill of lading to qualify the shipper for a reduced tariff also

resolve this issue today because we conclude that the justification for departure from the filed tariff schedule that the ICC set forth in its *Negotiated Rates* policy rests on an interpretation of the Act that is contrary to the language and structure of the statute as a whole and the requirements that make up the filed rate doctrine in particular.

Under the *Negotiated Rates* policy, the ICC has determined that a carrier engages in an unreasonable practice when it attempts to collect the filed rate after the parties have negotiated a lower rate. The ICC argues that its conclusion is entitled to deference because § 10701 does not specifically address the types of practices that are to be considered unreasonable and because its construction is rational and consistent with the statute. See *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837, 843 (1984).

We disagree. For a century, this Court has held that the Act, as it incorporates the filed rate doctrine, forbids as discriminatory the secret negotiation and collection of rates lower than the filed rate. See *supra*, at 126–128. By refusing to order collection of the filed rate solely because the parties had agreed to a lower rate, the ICC has permitted the very price discrimination that the Act by its terms seeks to prevent. See 49 U. S. C. § 10741 (1982 ed.). As we stated in *Armour Packing Co.* v. *United States*, 209 U. S. 56, 81 (1908):

> "If the rates are subject to secret alteration by special agreement then the statute will fail of its purpose to establish a rate duly published, known to all, and from which neither shipper nor carrier may depart. . . . [The Act] has provided for the establishing of one rate, to be filed as provided, subject to change as provided, and that rate to be while in force the only legal rate. Any other

did not require deviation from the filed tariff. See *Standard Brands, Inc.* v. *Central R. Co. of New Jersey*, 350 I. C. C. 555 (1974); *Carriers Traffic Service, Inc.* v. *Anderson, Clayton & Co.*, 881 F. 2d 475, 481–482 (CA7 1989) (collecting cases).

> construction of the statute opens the door to the possibility of the very abuses of unequal rates which it was the design of the statute to prohibit and punish."

Congress has not diverged from this interpretation and we decline to revisit it ourselves. See *California* v. *FERC*, 495 U. S. 490, 499 (1990) (recognizing the respect "this Court must accord to longstanding and well-entrenched decisions, especially those interpreting statutes that underlie complex regulatory regimes"). Once we have determined a statute's clear meaning, we adhere to that determination under the doctrine of *stare decisis*, and we judge an agency's later interpretation of the statute against our prior determination of the statute's meaning. Labeling the carrier's conduct an "unreasonable practice" cannot disguise the fact that the ICC is justifying deviation from the filed rate purely on the ground that the carrier and shipper have privately negotiated a lower rate. Stripped of its semantic cover, the *Negotiated Rates* policy and, more specifically, the Commission's interpretation of "unreasonable practices" thus stand revealed as flatly inconsistent with the statutory scheme as a whole, cf. *Fort Stewart Schools* v. *FLRA*, 495 U. S. 641, 645 (1990); *Dole* v. *Steelworkers*, 494 U. S. 26, 32 (1990), and §§ 10761 and 10762 in particular.

Nor can the *Negotiated Rates* policy be justified as a remedy for the carrier's failure to comply with § 10762's directive to file the negotiated rate with the ICC. See *Negotiated Rates I*, 3 I. C. C. 2d, at 103. The Commission argues that the carrier should not receive a windfall, *i. e.*, the higher filed rate, from its failure to comply with the statute. See Brief for Federal Respondent 25–27. But § 10761 *requires* the carrier to collect the filed rate, and we have never accepted the argument that such "equities" are relevant to the application of § 10761.[12] See, *e. g.*, *Maxwell*, 237 U. S., at 97. Indeed,

---

[12] Even if the equities of the situation were relevant, it is difficult to see how the equities favor the shipper. One would think that a shipper who has the market power to require a carrier to reduce his tariffs could also

strict adherence to the filed rate has never been justified on the ground that the carrier is equitably entitled to that rate, but rather that such adherence, despite its harsh consequences in some cases, is necessary to enforcement of the Act. See *supra*, at 126–128.

Compliance with §§ 10761 and 10762 is "utterly central" to the administration of the Act. *Regular Common Carrier Conference* v. *United States*, 253 U. S. App. D. C. 305, 308, 793 F. 2d 376, 379 (1986). "Without [these provisions] . . . it would be monumentally difficult to enforce the requirement that rates be reasonable and nondiscriminatory, . . . and virtually impossible for the public to assert its right to challenge the lawfulness of existing proposed rates." *Ibid.* (citations omitted). Although the ICC argues that the *Negotiated Rates* policy does not "abolis[h] the requirement in section 10761 that carriers must continue to charge the tariff rate," App. to Pet. for Cert. 36a, the policy, by sanctioning adherence to unfiled rates, undermines the basic structure of the Act. The ICC cannot review in advance the reasonableness of *unfiled* rates. Likewise, other shippers cannot know if they should challenge a carrier's rates as discriminatory when many of the carrier's rates are privately negotiated and

require proof from a carrier that the negotiated rates had been filed before tendering the shipment, especially since there are commercial services providing up-to-the-minute details of the carrier's rate schedule. But see *Fort Howard Paper Co.* v. *Maislin Industries, U. S., Inc.*, No. MC–C– 10983 (I. C. C. Aug. 4, 1987), p. 5 (unreasonable practice found even when the shipper had a copy of the tariff). Nevertheless, the Commission argues that if § 10761 "prevailed over the requirement of reasonable practices, a carrier could intentionally engage in 'bait and switch' tactics by negotiating one rate, fraudulently representing that it was properly filed, and then insisting upon collection of a higher tariff rate." Brief for Federal Respondent 30. We note first that the Commission determined that there was no intentional or fraudulent conduct in this case. Moreover, any carrier who engaged in such conduct could be punished under 49 U. S. C. § 11903(b) (1982 ed.). Finally, this risk of intentional misconduct on the part of a carrier has always existed and has never been considered sufficient to justify a less stringent interpretation of § 10761.

never disclosed to the ICC. Thus, although we agree that the Commission may have discretion to craft appropriate remedies for violations of the statute, see *ICC v. American Trucking Assns., Inc.*, 467 U. S. 354, 364–365 (1984), the "remedy" articulated in the *Negotiated Rates* policy effectively renders nugatory the requirements of §§ 10761 and 10762 and conflicts directly with the core purposes of the Act.

The ICC maintains, however, that the passage of the Motor Carrier Act of 1980 (MCA), Pub. L. 96–296, 94 Stat. 793, justifies its *Negotiated Rates* policy. The MCA substantially deregulated the motor carrier industry in many ways in an effort to "promote competitive and efficient transportation services." Pub. L. 96–296, § 4, formerly codified at 49 U. S. C. § 10101(a)(7) (1976 ed., Supp. V). In addition to loosening entry controls, see § 5, codified at 49 U. S. C. § 10922 (1982 ed.), the MCA also created a zone of reasonableness within which carriers can raise rates without interference from the ICC. See § 11, codified at 49 U. S. C. § 10708 (1982 ed.). More importantly, the MCA also allows motor carriers to operate as both common carriers and contract carriers. See § 10(b)(1), amending 49 U. S. C. § 10930(a) (1982 ed.). A contract carrier transports property under exclusive agreements with a shipper, see § 10102(14), and the Commission has exempted all motor contract carriers from the requirements of §§ 10761 and 10762. See *Exemption of Motor Contract Carriers from Tariff Filing Requirements*, 133 M. C. C. 150 (1983), aff'd *sub nom. Central & Southern Motor Freight Tariff Assn., Inc. v. United States*, 244 U. S. App. D. C. 226, 757 F. 2d 301, cert. denied, 474 U. S. 1019 (1985).[14] The Commission has also relaxed the

---

[14] The Act specifically provides that the Commission may "grant relief" from the filing requirements to motor contract carriers "when relief is consistent with the public interest and the transportation policy." §§ 10761(b), 10762(f); see also § 10702(b). The Commission concluded that granting a classwide exemption rather than individual exemptions was both in the public interest and consistent with the purpose behind the Act. See *Exemption of Motor Contract Carriers from Tariff Filing Require-*

regulations relating to motor common carriers, most significantly, by allowing decreased rates to go into effect one day after the filing of a tariff. See *Short Notice Effectiveness for Independently Filed Rates*, 1 I. C. C. 2d 146 (1984), aff'd *sub nom. Southern Motor Carriers Rate Conference* v. *United States*, 773 F. 2d 1561 (CA11 1985).[14] In *Negotiated Rates I* and *II*, the Commission concluded that in light of the more competitive environment, strict adherence to the filed rate doctrine "is inappropriate and unnecessary to deter discrimination today." *Negotiated Rates I*, 3 I. C. C., at 106. According to the Commission, "'the inability of a shipper to rely on a carrier's interpretation of a tariff is a greater evil than the remote possibility that a carrier might intentionally misquote an applicable tariff rate to discriminate illegally between shippers.'" *Ibid.*, quoting *Seaboard System R. Co.* v. *United States*, 794 F. 2d 635, 638 (CA11 1986).

We reject this argument. Although the Commission has both the authority and expertise generally to adopt new policies when faced with new developments in the industry, see *American Trucking Assns., Inc.* v. *Atchison, T. & S. F. R. Co.*, 387 U. S. 397, 416 (1967), it does not have the power

---

*ments,* 133 M. C. C., at 156–158. The Commission has also allowed contract carriers to obtain permits to serve entire classes of unnamed shippers. See *Issuance of Permits Authorizing Industrywide Service*, 133 M. C. C. 298 (1983).

[14] The Act provides that rates will not go into effect until 30 days after the filing of a tariff, see § 10762(c)(3), but specifically allows the Commission to reduce the period if "cause exists." § 10762(d)(1). The Commission determined that cause existed to reduce the waiting period to one day after the filing of a tariff reducing rates and seven days after the filing of a tariff increasing rates. See *Short Notice Effectiveness for Independently Filed Rates*, 1 I. C. C. 2d, at 150–160. In addition, the Commission has determined that neither tariffs applicable to a single shipper nor rates providing volume discounts are *per se* discriminatory. See *Rates for a Named Shipper or Receiver*, 367 I. C. C. 2d 959 (1984); *Petition for Declaratory Order—Lawfulness of Volume Discount Rates by Motor Common Carriers of Property*, 365 I. C. C. 711 (1982). We express no view today on the validity of such policies.

to adopt a policy that directly conflicts with its governing statute. Nothing in the MCA repeals §§ 10761 and 10762 or casts doubt on our prior interpretation of those sections. Generalized congressional exhortations to "increase competition" cannot provide the ICC authority to alter the well-established statutory filed rate requirements. As we said in *Square D Co.* v. *Niagara Frontier Tariff Bureau, Inc.*, with respect to a similarly longstanding judicial interpretation of the Act:

> "Congress must be presumed to have been fully cognizant of this interpretation of the statutory scheme, which had been a significant part of our settled law for over half a century, and . . . Congress did not see fit to change it when Congress carefully reexamined this area of the law in 1980. [Respondent has] pointed to no specific statutory provision or legislative history indicating a specific congressional intention to overturn the longstanding . . . construction; harmony with the general legislative purpose is inadequate for that formidable task." 476 U. S., at 420 (footnotes omitted).

See also *California* v. *FERC*, 495 U. S., at 498, 499–500. Even before the passage of the MCA, Congress had allowed the Commission to exempt motor *contract* carriers from the requirement that they adhere to the published tariff, see 49 U. S. C. § 10761(b) (1982 ed.), demonstrating that Congress is aware of the requirement and has deliberately chosen not to disturb it with respect to motor *common* carriers.[15] If

---

[15] Moreover, in the Household Goods Transportation Act of 1980, Pub. L. 96–454, 94 Stat. 2011, Congress provided that "motor common carrier[s] providing transportation of household goods . . . may, subject to the provisions of this chapter *(including the general tariff requirements of section 10762 of this title)*, establish a rate for the transportation of household goods which is based on the carrier's written, binding estimate of charges for providing such transportation." 49 U. S. C. § 10735(a)(1) (1982 ed., Supp. V) (emphasis added). This exception for household goods carriers also demonstrates that Congress is aware of, but has elected not to elimi-

strict adherence to §§ 10761 and 10762 as embodied in the
filed rate doctrine has become an anachronism in the wake of
the MCA, it is the responsibility of Congress to modify or
eliminate these sections.

Accordingly, the judgment of the Court of Appeals is re-
versed, and the cause is remanded for further proceedings
consistent with this opinion.

*It is so ordered.*

JUSTICE SCALIA, concurring.

I join the Court's opinion but add a few words in response
to JUSTICE STEVENS' assertion that the Court has "fail[ed]
to adhere today to the teaching of *Chevron* [*U. S. A. Inc.*
v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837
(1984)]." *Post*, at 152.

In my view, the Court correctly relies upon our prior "filed
rate" decisions, which were based not on the "regulatory
scheme as a whole," *post*, at 144—by which JUSTICE STE-
VENS appears to mean the regulatory climate within which
the statute then operated, *post*, at 145–146—but rather on
the text of the statute. JUSTICE STEVENS argues that there
is no textual limitation on the scope of the term "reasonable,"
as that term is used in 49 U. S. C. § 10701(a) (1982 ed.) ("A
. . . practice related to transportation or service provided by
a carrier . . . must be reasonable"), and that we must there-
fore accord deference to the Commission's interpretation of
that term. *Post*, at 140–141, 151–152. I do not agree.
Whatever else may qualify as an unreasonable practice,
under no sensible construction of that term could it consist of
failing to do what the statute explicitly *prohibits* doing—viz.,
charging or receiving a rate different from the rate specified
in a tariff. 49 U. S. C. § 10761(a) (1982 ed.).

Nor can the phrase "[e]xcept as provided in this subtitle,"
§ 10761(a), carry the enormous weight that JUSTICE STE-

---

nate as applied to other motor common carriers, the general requirements
of §§ 10761 and 10762.

VENS places upon it. *Post*, at 142–143, and n. 6. That clause is affixed to only the *first* sentence of § 10761(a), which states that before providing transportation and services, certain carriers must place their rates on file. (What is referred to by the exception is obvious—such provisions as § 10762(a)(1), which states that certain motor contract carriers that serve only one shipper need file only minimum rates.) But it is the *second* sentence of § 10761(a) that contains the requirement that only filed rates can be charged. Of course the subject of the second sentence, *"[t]hat* carrier" (emphasis added), must reasonably be deemed to refer to a carrier covered by the first sentence—so that the obligation to charge the filed rate applies only to those carriers *required* to file "the rate for the transportation or service." (Thus, a motor contract carrier required to file only minimum rates under § 10762(a)(1) can charge rates higher than those minimums.) But there is no way in which the "[e]xcept as provided" clause can be imported directly into the second sentence, causing it to recite an exception to the obligation to charge the required-to-be-filed rate, which JUSTICE STEVENS asserts can refer to the "reasonable practices" requirement of § 10701(a) as readily as it can to the "reasonable rate" requirement. *Post*, at 141–142. The basis for the "unreasonable rate" exception to the "filed rate" rule is not the "[e]xcept as provided" language at all; rather it is the need to reconcile two textual provisions that would otherwise be categorically inconsistent (do not charge unreasonable rates, but charge whatever rates you have filed). While an "unreasonable rate" unavoidably means a rate that is economically unreasonable—so that where economic unreasonableness exists §§ 10701(a) and 10761(a) *need* to be reconciled by assuming an implicit but unexpressed exception to the filed rate requirement—an "unreasonable practice" does *not* unavoidably mean charging the filed rate when a different rate has been promised, so with respect to that term normal construction of § 10701(a) (as in the previous paragraph) avoids any difficulty.

Finally, JUSTICE STEVENS points to changes in the motor carrier industry occasioned in part by 1980 amendments to the statute, which amendments he says "represented a fundamental policy choice in favor of deregulation." *Post*, at 147. See also *post*, at 147–151. But the only amendments of any relevance to the requirement of § 10761(a) that a carrier collect no rate other than the filed rate are those that remove certain pre-existing barriers to motor contract carriage, see generally *Central & Southern Motor Freight Tariff Association, Inc.* v. *United States*, 244 U. S. App. D. C. 226, 757 F. 2d 301, 311–312 (1985) *(per curiam)*—which amendments have the practical effect of making more carriers eligible for the *pre-existing exception* to the filing requirement of § 10761(a), permitting the Commission to exempt them under certain circumstances. § 10761(b). While this plainly reflects an intent to deregulate, it reflects an intent to deregulate *within the framework of the existing statutory scheme.* Perhaps deregulation cannot efficiently be accomplished within that framework, but that is Congress' choice and not the Commission's or ours. It may well be, as JUSTICE STEVENS thinks, that after the 1980 amendments and the various administrative changes that the Commission has made by rule, "'[t]he skeleton of regulation remains; the flesh has been stripped away.'" *Post*, at 148, quoting *Orscheln Bros. Truck Lines, Inc.* v. *Zenith Electric Corp.*, 899 F. 2d 642, 644–645 (CA7 1990). But it is the skeleton we are construing, and we must read it for what it says.

JUSTICE STEVENS, with whom THE CHIEF JUSTICE joins, dissenting.

The "filed rate doctrine" was developed in the 19th century as part of a program to regulate the ruthless exercise of monopoly power by the Nation's railroads. Today the Court places an interpretation on that doctrine even more strict than the original version. In doing so, the Court misreads the text of the Interstate Commerce Act (Act), 49 U. S. C. § 10101 *et seq.* (1982 ed.), ignores the history of motor carrier

regulation in this country, and gives no deference to the sensible construction of the Act by six Courts of Appeals[1] and the administrative agency responsible for its enforcement. Most significantly, the majority fails to appreciate the significance of the "sea change" in the statutory scheme that has converted a regime of regulated monopoly pricing into a highly competitive market. Even wearing his famous blinders, old Dobbin would see through the tired arguments the Court accepts today.

I

As originally enacted in 1887, the Act provided, in part:

"And when any such common carrier shall have established and published its rates, fares, and charges in compliance with the provisions of this section, it shall be unlawful for such common carrier to charge, demand, collect, or receive from any person or persons a greater or less compensation for the transportation of passengers or property, or for any services in connection therewith, than is specified in such published schedule of rates, fares, and charges as may at the time be in force." 24 Stat. 381.

Read literally, this text commanded strict adherence to the tariffs filed by a carrier. From the beginning, however, the Court construed that command as subject to the unstated ex-

---

[1] See *Delta Traffic Service, Inc.* v. *Transtop, Inc.*, 902 F. 2d 101 (CA1 1990); *Delta Traffic Service, Inc.* v. *Appco Paper & Plastics Corp.*, 893 F. 2d 472 (CA2 1990); *Orscheln Bros. Truck Lines, Inc.* v. *Zenith Electric Corp.*, 899 F. 2d 642 (CA7 1990); 879 F. 2d 400 (CA8 1989) (case below); *West Coast Truck Lines, Inc.* v. *Weyerhaeuser Co.*, 893 F. 2d 1016 (CA9 1990); *Seaboard System R. Co.* v. *United States*, 794 F. 2d 635 (CA11 1986). The decision of the Court of Appeals for the Eleventh Circuit in *Seaboard System* involved railroad regulation rather than motor carrier regulation, but presented very similar issues.

The sole exception to this consensus is *In re Caravan Refrigerated Cargo, Inc.*, 864 F. 2d 388 (CA5 1989).

ception that a filed rate would not be enforced if the Interstate Commerce Commission (Commission) determined that the rates were "unreasonable."[2]  Amendments to the Act incorporated language that expressly allows exceptions in cases in which the Commission determines that strict enforcement would be unreasonable.[3]

Thus, 49 U. S. C. § 10761(a) (1982 ed.) now provides:

> *"Except as provided in this subtitle,* a carrier providing transportation or service subject to the jurisdiction of the Interstate Commerce Commission under chapter 105 of this title shall provide that transportation or service only if the rate for the transportation or service is contained in a tariff that is in effect under this subchapter. That carrier may not charge or receive a different compensation for that transportation or service than the rate specified in the tariff whether by returning a part of that rate to a person, giving a person a privilege, allowing the use of a facility that affects the value of that transportation or service, or another device." (Emphasis added.)

The emphasized language in the foregoing provision obviously refers, *inter alia,* to § 10701(a) which states, in part:

---

[2] Thus, in the most frequently quoted statement of the filed rate doctrine, we wrote:

"Under the Interstate Commerce Act, the rate of the carrier duly filed is the only lawful charge.  Deviation from it is not permitted upon any pretext.  Shippers and travelers are charged with notice of it, and they as well as the carrier must abide by it, *unless it is found by the Commission to be unreasonable."  Louisville & Nashville R. Co.* v. *Maxwell,* 237 U. S. 94, 97 (1915) (emphasis added).

Similarly, in *Keogh* v. *Chicago & Northwestern R. Co.,* 260 U. S. 156, 163 (1922), we wrote:

"The legal rights of shipper as against carrier in respect to a rate are measured by the published tariff.  *Unless and until suspended or set aside,* this rate is made, for all purposes, the legal rate, as between carrier and shipper."  (Emphasis added.)

[3] See, *e. g.,* 34 Stat. 587.

"A *rate* (other than a rail rate), classification, rule, *or practice* related to transportation or service provided by a carrier subject to the jurisdiction of the Interstate Commerce Commission under chapter 105 of this title *must be reasonable.*" (Emphasis added.)

Furthermore, § 10704(b) expressly authorizes the Commission, after finding that a rate or practice of a carrier is unreasonable, to prescribe the rate or practice that the carrier must follow.[4]

The action of the Commission in this case faithfully tracks its statutory grant of authority. After considering all of the relevant evidence, the Commission determined "that it would be an unreasonable practice now to require Primary to pay undercharges for the difference between the negotiated rates and the tariff rates." App. to Pet. for Cert. 44a. That determination was unquestionably consistent with the plain language of the statute governing the Commission's authority. A carrier's failure to file negotiated rates obviously does not make it reasonable for the carrier to quote low rates and collect higher ones; the Commission is free to find, as it has done, that a practice of misquotation, failure to file, and subsequent collection is unreasonable under § 10701(a).

The Court offers no reason whatsoever to doubt this conclusion. Indeed, the Court's discussion of the statutory text consists almost entirely of vague references to some unarticulated

---

[4] Title 49 U. S. C. § 10704(b)(1) (1982 ed. and Supp. V) provides, in part: "When the Commission decides that a rate charged or collected by—

"(A) a motor common carrier for providing transportation subject to its jurisdiction under subchapter II of chapter 105 of this title by itself, with another motor common carrier, with a rail, express, or water common carrier, or any of them;

.     .     .     .     .

"or that a classification, rule, or practice of that carrier, does or will violate this chapter, the Commission shall prescribe the rate (including a maximum or minimum rate, or both), classification, rule, or practice to be followed."

interplay between §§ 10761(a) and 10762(a)(1),[5] see *ante*, at 126–127, an interplay which the Court contends would be "render[ed] nugatory" if carriers are not permitted to obtain payment of the filed rate when they have led shippers to rely upon a lower negotiated rate. *Ante*, at 133. For the reasons I have already stated, the text of those provisions does not generate any "interplay" capable of sustaining so rigid an inference. The Court virtually concedes as much, for it recognizes that the unreasonableness of a rate is a longstanding ground for denying collection of the filed rate, *ante*, at 128–129, and n. 10, and refuses to hold that the unreasonableness of a practice can never bar collection of a filed rate, *ante*, at 129–130.

Having admitted that the doctrine synthesized from the "interplay" between §§ 10761(a) and 10762(a)(1) is susceptible of exceptions based upon the nature of a carrier's rates and practices, the Court can argue only that this particular exception is impermissible.[6] The source of the exceptions is,

---

[5] Section 10762(a)(1) provides:

"A motor common carrier shall publish and file with the Commission tariffs containing the rates for transportation it may provide under this subtitle. The Commission may prescribe other information that motor common carriers shall include in their tariffs."

[6] The Court attempts to make hay of the fact that under § 10761(a) carriers "may not charge or receive a different compensation for that transportation or service than the rate specified in the tariff." According to the Court, this provision "*requires* the carrier to collect the filed rate." *Ante*, at 131. That is true if the Court means that the carrier is obligated to seek payment of the filed rate, but not if the Court means that the carrier is entitled to receive payment of the filed rate. The longstanding reasonableness exception to the filed rate doctrine—an exception not contested by the Court—makes this much clear. Moreover, as has already been noted, the clause that prefaces § 10761(a) allows for the existence of exceptions to the collection requirement. The Court's argument simply begs the question before us, which is under what conditions a valid defense to a carrier's suit may exist.

Even less persuasive than the Court's argument from the collection requirement is a related claim made by petitioners. They contend that because carriers are legally obligated to collect the filed rate, the practice of filing suit to collect that rate cannot be unreasonable. See, *e. g.*, Reply

however, not the "interplay" that dominates the majority's reasoning, but the combined effect of the "Except as otherwise provided" language of § 10761(a) and the express authority to determine reasonableness granted to the Commission by § 10701(a). This second "interplay" gets little attention from the majority, and it is difficult to see how the text of either component might yield the distinction which the majority insists upon drawing. Nor can the Court mean that the exception literally voids the obligations imposed by §§ 10761(a) and 10762(a)(1), because the Commission maintains, and the Court does not deny, that the filed rate doctrine would still provide an effective right to recover for undercharges in some cases. See, e. g., NITL—Petition to Institute Rulemaking on Negotiated Motor Common Carrier Rates, 5 I. C. C. 2d 623, 629, and n. 13 (1989). Moreover, even if the "filed rate doctrine" were discarded entirely, a knowing or willful failure to comply with §§ 10761(a) and 10762(a)(1) may subject a carrier to prosecution.[7]

---

Brief for Petitioners 7–8. This argument, too, ignores the exceptions clause at the beginning of § 10761(a). Moreover, the argument mischaracterizes the practice deemed unreasonable by the Commission: A collection suit is one component of that practice, even though the suit considered in isolation from the broader course of conduct is not itself unreasonable. See NITL—Petition to Institute Rulemaking on Negotiated Motor Common Carrier Rates, 5 I. C. C. 2d 623, 628, n. 11 (1989); see also ante, at 122.

JUSTICE SCALIA trots out the same argument again, this time harnessed to an assertion that the exceptions clause applies only to the first sentence of § 10761(a). Ante, at 137 (concurring opinion). Although that is perhaps a possible reading of § 10761(a), it is obviously not the only one. There is no reason to believe that it is an interpretation of the section that the Commission must accept. In any event, JUSTICE SCALIA admits that § 10701(a)—which imposes a reasonableness condition upon practices and rates alike—modifies the requirements of § 10761(a), and this admission renders moot his discussion of the exceptions clause. Ibid. (concurring opinion). In light of that admission, JUSTICE SCALIA's argument fails for exactly the reasons set out above.

[7] See, e. g., 49 U. S. C. §§ 11903 and 11904 (1982 ed.).

The Court's assertion that the agency policy now before us "renders nugatory" the "interplay" between §§ 10761(a) and 10762(a)(1) therefore amounts to no more than an observation that the policy substantially diminishes the importance of the "filed rate doctrine" as a means for enforcing those sections. Consideration of the statute's structure makes all the more clear what should already be evident from the statutory text: The Court's observation is true but utterly irrelevant.

## II

Because no particular provision of the statute supports the Court's position, its principal argument must be that the agency's construction of the Act is inconsistent with the regulatory scheme as a whole. See *ante*, at 131. There are, of course, important differences between markets in which prices are regulated, either by private cartels or by public authority, and those in which prices are the product of independent decisions by competitors. Rules requiring adherence to predetermined prices are characteristic of regulated markets, but are incompatible with independent pricing in a competitive market.[8] The "filed rate doctrine" has played an important role, not just in the segments of the transportation industry regulated by the Commission, but in other regulated markets as well.[9] It requires the courts to respect the public agency's control over

---

[8] See, *e. g.*, *Sugar Institute, Inc.* v. *United States*, 297 U. S. 553, 582–583 (1936) (regulation by private agreement in violation of the Sherman Act); *California Retail Liquor Dealers Assn.* v. *Midcal Aluminum, Inc.*, 445 U. S. 97, 99 (1980) (state regulation of wine prices); *United Gas Pipe Line Co.* v. *Mobile Gas Service Corp.*, 350 U. S. 332, 338 (1956) (federal regulation of natural gas prices).

[9] See, *e. g.*, *Montana-Dakota Utilities Co.* v. *Northwestern Public Service Co.*, 341 U. S. 246, 251–252 (1951) (federal regulation of prices for electrical power); *Arkansas Louisiana Gas Co.* v. *Hall*, 453 U. S. 571, 577–578 (1981) (federal regulation of prices for natural gas); *H. J. Inc.* v. *Northwestern Bell Telephone Co.*, 492 U. S. 229, 234, n. 1 (1989) (state regulation of rates for telephone service).

market prices and industry practices; moreover, it significantly reduces the temptation of regulated parties to deviate from the marketwide rules formulated by the agency.

The filed rate doctrine has been a part of our law during the century of regulation of the railroad industry by the Commission. In 1935, when Congress decided to impose economic regulation on the motor carrier industry, partly if not primarily in order to protect the railroads from too much competition,[10] the filed rate doctrine was applied to their rates just as it had previously applied to the railroads. It had the same regulatory purpose.[11] In its applications dur-

---

[10] "Though identical statutory standards govern both motor carrier and rail consolidations, their legislative backgrounds differ. The demand for motor carrier regulation came, not from shippers, as in railroads, but from the roads themselves, who urged that virtually unregulated motor carrier competition threatened railroad financial stability. This view was also supported by the Interstate Commerce Commission, and the Federal Coordinator of Transportation who, in his 1934 and 1935 reports, recommended legislation regulating interstate motor carriers. In addition, during hearings on proposed legislation, many truck operators, previously opposed to Federal regulation, favored such control because they feared the effects of unrestrained competition on the motor carrier industry itself. The result was legislation, enacted in 1935, which from the first placed considerable restraint on motor carrier competition.

"Entry was controlled by certificates of convenience and necessity; those already in the field were given a preferred position by the grandfather clauses, assuring not only the right to continue in operation, but also to expand within the areas or between the points which they already served. Moreover, the Commission was empowered to establish minimum as well as maximum rates. And this minimum rate power was soon utilized by the Commission both to protect the railroads from motor carrier competition as well as to safeguard the motor carrier industry from 'destructive' competition within its own ranks. Indeed, from the inception of motor carrier regulation to the present day, the power to fix minimum rates has been more significant than the authority to fix maximum charges." Report of the Attorney General's National Committee to Study the Antitrust Laws 265 (1955).

[11] "To understand the purpose of the filed-rate doctrine and hence the Commission's recent efforts to relax it, on which see *National Industrial Transportation League—Petition to Institute Rulemaking on Negotiated*

ing the period of regulatory control over motor carrier rate-making, the doctrine was for the most part applied to reinforce the policies and the decisions of the regulatory agency.[12]

*Motor Common Carrier Rates*, 3 I. C. C. 2d 99 (1986); *Buckeye Cellulose Corp.* v. *Louisville & Nashville R. R.*, 1 I. C. C. 2d 767 (1985), affirmed as *Seaboard System R. R.* v. *United States*, *supra; Petition to Institute Rulemaking on Negotiated Motor Common Carrier Rates*, 5 I. C. C. 2d 623 (1989), one must understand the history of federal regulation of common carriers. Railroads have heavy fixed costs, and in their heyday faced little effective competition from other modes of transportation. Naturally they tended to load the fixed costs onto those shippers who had poor competitive alternatives and to charge low prices to those shippers who had good alternatives by reason of (for example) being big enough to induce two or more railroads to serve their plants. This created a disparity in transportation costs painful to shippers who paid high railroad rates and were competing with shippers who paid low rates, and it also undermined the railroads' efforts to cartelize railroad transportation. The confluence of interests between railroads and weak shippers resulted in a regulatory scheme in which railroads were forbidden both to price off tariff and to refuse service to any shipper at the tariffed rate. *Western Transportation Co.* v. *Wilson & Co.*, *supra*, 682 F. 2d at 1230–31. The scheme would have been undermined if carriers had been permitted to negotiate secret discounts with favored shippers. *Regular Common Carrier Conference* v. *United States*, 793 F. 2d 376, 379 (D. C. Cir. 1986). To deter this was the office of the filed-rate doctrine. It authorized carriers to recover the discounts regardless, which meant that the shipper could not count on being able to keep any discount that the railroad might dangle before it. Motor carriers do not have heavy fixed costs, but they do not like competition any more than railroads do, so when in 1935 they were brought under federal regulation (in major part to protect the railroads from their competition) they were placed under the filed-rate doctrine too." *Orscheln Bros. Truck Lines, Inc.* v. *Zenith Electric Corp.*, 899 F. 2d, at 643–644.

[12] As the Court's opinion makes clear, there was no tension between judicial interpretation and agency policy in the cases that developed the filed rate doctrine. See *ante*, at 128, citing *Poor* v. *Chicago, B. & Q. R. Co.*, 12 I. C. C. 418, 421–422 (1907). On the contrary, a recurring theme in those cases is that the Commission, rather than the courts, should have primary responsibility for administration of the statute. The filed rate doctrine was regarded in significant part as a means for ensuring that this allocation of responsibility was respected. See, *e. g.*, *Texas & Pacific R. Co.* v. *Abilene Cotton Oil Co.*, 204 U. S. 426, 440–442 (1907); *Arizona Grocery Co.* v.

After years of debate over whether it was sound policy to substitute regulation for competition in the motor carrier industry, Congress decided to eliminate the regulatory barriers to free entry and individual ratemaking. The 1980 amendments to the Act represented a fundamental policy choice in favor of deregulation.[13] Overnight the application of the filed rate doctrine in that market became an anachronism. As Judge Posner has explained:

> "Many years later came deregulation, which has changed the trucking industry beyond recognition. As a result of amendments made to the Motor Carrier Act in 1980 and their interpretation by the Commission, the present regime is essentially one of free competition. No longer does the ICC seek to nurture and protect cartel pricing and division of markets. A motor carrier that wants to lower its price can file a new tariff effective the following day. *Short Notice Effectiveness for Independently Filed Motor Carrier and Freight Forwarder Rates*, 1 I. C. C. 2d 146 (1984), affirmed as *Southern Motor Carriers Rate Conference* v. *United States*, 773 F. 2d 1561 (11th Cir. 1985). No longer does the Commission seek to limit the number of motor carriers, which

---

*Atchison, T. & S. F. R. Co.*, 284 U. S. 370, 384–385 (1932); *Baldwin* v. *Scott County Milling Co.*, 307 U. S. 478, 483–485 (1939). The most notable exception to this pattern is the 5-to-4 decision in *T. I. M. E. Inc.* v. *United States*, 359 U. S. 464 (1959), in which this Court prohibited district courts from staying collection proceedings pending agency review of the reasonableness of a filed rate. Although *T. I. M. E.* is strikingly similar to today's decision in a host of respects, the majority does not rely upon it. Its reluctance to place any substantial weight upon *T. I. M. E.* is easily understood because that precedent was greatly limited by this Court's subsequent decision in *Hewitt-Robins Inc.* v. *Eastern Freight-Ways, Inc.*, 371 U. S. 84, 88–89 (1962), and what remained of it was soon thereafter unambiguously repudiated by Congress. See Act of Sept. 6, 1965, Pub. L. 89–170, §§ 6–7, 79 Stat. 651–652 (codified at 49 U. S. C. § 11705(b)(3) (1982 ed. and Supp. V), 49 U. S. C. § 11706(c)(2) (1982 ed.)).

[13] Motor Carrier Act of 1980, Pub. L. 96–296, 94 Stat. 793.

has more than doubled in less than a decade. Most important, a carrier and shipper who want to get out from under tariff regulation altogether have only to negotiate a contract of carriage, and then the lawful price is the price in the contract rather than in any filed tariff. There used to be all sorts of restrictions on contract carriage, which greatly limited it as an escape hatch from regulation. There are no longer. *Wheaton Van Lines, Inc.* v. *ICC*, 731 F. 2d 1264 (7th Cir. 1984). The skeleton of regulation remains; the flesh has been stripped away." *Orscheln Bros. Truck Lines, Inc.* v. *Zenith Electric Corp.*, 899 F. 2d 642, 644 (CA7 1990).

The significance of these fundamental changes was also noted and explained by Judge Alarcon:

"A variety of practices that previously would have been considered discriminatory are now allowed. For example, the ICC has recently ruled that volume discount rates are not per se unlawful and may be justified by cost savings to the carrier. *See Lawfulness of Volume Discount Rates by Motor Common Carrier of Property*, 365 I. C. C. 711, 715–16 (1982). Moreover, carriers may impose geographic or product line restrictions that must be met to obtain rate reductions. *See Rates for Named Shipper or Receiver*, 367 I. C. C. 959, 962–965 (1984).

"In addition to increased competitive pressures, statutory changes, and a relaxed regulatory climate, the ICC's *Negotiated Rates* decisions are a practical response to the information costs faced by shippers. The ease of filing tariffs and the sheer number filed no longer makes it appropriate to allocate the burden of discovering a filed rate to the shipper in all cases. Reduced tariff rates may now be filed to become effective on one day's notice." *West Coast Truck Lines, Inc.* v. *Weyerhaeuser Co.*, 893 F. 2d 1016, 1026 (CA9 1990).

The Court catalogs these reforms, *ante*, at 133–134, but fails to analyze their implications for the "reasonableness" requirement of § 10701(a) and, consequently, for the provisions of § 10761(a). What the Court now misses has been succinctly set forth by Judge Alarcon:

> "The ICC's determination that the collection of undercharges constitutes an unreasonable practice if the shipper is unaware of the filed rate is also a reflection of changing legislative goals. Congress modified national transportation policy when it amended 49 U. S. C. § 10101(a) in the Motor Carrier Act of 1980. Section 10101(a)(2) now directs the Commission, 'in regulating transportation by motor carrier, to promote competitive and efficient transportation services in order to (A) meet the needs of shippers, receivers, passengers, and consumers; [and] (B) allow a variety of quality and price options to meet changing market demands and the diverse requirements of the shipping and traveling public . . . .' 49 U. S. C. § 10101(a)(1)(A), (B) (1982). In addition, § 10101(a)(1)(D) directs the ICC to encourage the establishment of reasonable transportation rates without 'unfair or destructive competitive practices.' 49 U. S. C. § 10101(a)(1)(D) (1982). Congress intended these sections of the Motor Carrier Act 'to emphasize the importance of competition and efficiency as the most desirable means for achieving transportation goals while, at the same time, providing the Commission with sufficient flexibility to promote the public interest.' H. R. Rep. No. 96–1069, 96th Cong., 2d Sess. 12, *reprinted in* 1980 U. S. Code Cong. & Admin. News 2283, 2294.

> "Section 10701(a) provides the ICC with the mechanism to put into effect Congress' restated goals of national transportation policy. By declaring the adherence to filed rates unreasonable under the circumstances presented in this case, the ICC has demonstrated its intention to prevent carriers from engaging in unfair

competitive practices." *Weyerhaeuser*, 893 F. 2d, at 1026–1027.

Despite the Court's puzzling suggestion that the filed rate doctrine is essential to the "core purposes of the Act," *ante*, at 133, the doctrine is instead, as the Court elsewhere seems to concede, "an anachronism in the wake of the [Motor Carrier Act of 1980]," *ante*, at 136. If plain text is a poor basis for the Court's holding, statutory purpose is altogether worse. As Judge Posner has explained:

> "Counsel for the carrier in this case—which is to say for the carrier's trustee in bankruptcy—conceded at argument that the motor carrier industry is today highly competitive. But if so, the filed-rate doctrine has lost its raison d'etre. The classic explanations for the doctrine are from a different world. 'If a mistake in naming a rate between two given points is to be accepted as requiring the application of that rate by the carrier, the great principle of equality in rates, to secure which was the very purpose and object of the enactment of these several statutes, might as well be abandoned.' *Poor* v. *Chicago, Burlington & Quincy Ry.*, *supra*, 12 I. C. C. at 421. 'Stability and equality of rates are more important to commercial interests than reduced rates.' *Id.*, at 422. 'Occasional hardships may result from any inelastic rule of general application. The principle, however, is vital in our commercial life that there shall be one fixed and absolutely rigid rate governing the transportation at a given time of any given commodity between two given points.' *Id.*, at 423.
>
> "*Cessante ratione legis, cessat et ipsa lex.* Firms in a competitive market cannot discriminate against weak shippers, for even the weak shipper has, by definition of competition, alternative sources of supply to which to turn if one of his suppliers tries to make a monopoly profit off him. 'In the more competitive, more flexible pricing atmosphere created by [deregulation], there is

little likelihood of carriers using a rate misquotation as a means to discriminate in favor of particular shippers.' *Petition to Institute Rulemaking on Negotiated Motor Common Carrier Rates, supra,* 5 I. C. C. 2d at 625. And since it is no longer the policy of Congress or the ICC to foster monopoly pricing in the motor carrier industry, no public object is served by forcing carriers to adhere to published price schedules regardless of circumstances. All this the Commission found and persuasively articulated in *National Industrial Transportation League, supra,* 3 I. C. C. 2d at 104–08." *Orscheln,* 899 F. 2d, at 644–645.

Judge Posner's conclusion that strict mechanical adherence to the filed rate doctrine produces absurd results and serves no social purpose, *id.,* at 645, is one that I share. It is likewise shared by the agency charged with administration of the Act.

### III

A few years ago, in *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.,* 467 U. S. 837 (1984), we reiterated the importance of giving appropriate deference to an agency's reasonable interpretation of its governing statute. Indeed, long before our decision in *Chevron,* we recognized that even when faced with a "long history of the Commission's construction and application of the Act contrary to its present position," *American Trucking Assns., Inc.* v. *Atchison, T. & S. F. R. Co.,* 387 U. S. 397, 415 (1967), we must defer to the Commission's interpretation of a statute which it is responsible for administering:

"[W]e agree that the Commission, faced with new developments or in light of reconsideration of the relevant facts and its mandate, may alter its past interpretation and overturn past administrative rulings and practice. . . . In fact, although we make no judgment as to the policy aspects of the Commission's action, this kind of flex-

ibility and adaptibility to changing needs and patterns of transportation is an essential part of the office of a regulatory agency." *Id.*, at 416.

Four Courts of Appeals have expressly invoked *Chevron* in the course of upholding the agency action challenged in this case,[14] but this Court does not deem *Chevron*—or any other case involving deference to agency action—worthy of extended discussion. The Court dismisses *Chevron* by means of a conclusory assertion that the agency's interpretation is inconsistent with "the statutory scheme as a whole." *Ante*, at 131. Insofar as the Court offers any justification for that result, it does so by relying on cases in which this Court's action was entirely consistent with the agency's interpretation of the Act.[15] The fact that the Court has strictly enforced the filed rate doctrine in the many cases in which it served the agency's regulatory purposes provides no justification for enforcing the doctrine in a competitive market in which it frustrates the agency's attempt to carry out the plainly expressed intent of Congress.

The Court's failure to adhere today to the teaching of *Chevron* is compounded by its misplaced reliance on *Square D Co.* v. *Niagara Frontier Tariff Bureau, Inc.*, 476 U. S. 409 (1986). See *ante*, at 134–135. In *Square D*, we adhered to a longstanding settled construction of § 4 of the Clayton Act that had not been affected by any subsequent statutory amendment. No question of agreeing or disagreeing with agency action, or with an agency's interpretation of a congressional policy choice, was presented. That case is therefore totally inapplicable to the question presented here. Even less persuasive authority for the Court's position is *California* v. *FERC*, 495 U. S. 490 (1990), see *ante*, at 131, 135, a case in which we up-

---

[14] *Delta Traffic Service, Inc.* v. *Transtop, Inc.*, 902 F. 2d, at 109; *Orscheln Bros. Truck Lines, Inc.* v. *Zenith Electric Corp.*, 899 F. 2d, at 646; 879 F. 2d, at 406 (case below); *West Coast Truck Lines, Inc.* v. *Weyerhaeuser Co.*, 893 F. 2d, at 1023, 1025–1026.

[15] See n. 12, *supra.*

held an agency interpretation that conformed to longstanding precedent.

## IV

Finally, I must express my emphatic agreement with the Commission's conclusion, App. to Pet. for Cert. 44a, that an unreasonable practice would result if the carrier in this case were rewarded for violating its duty to file a new rate promptly. There is no evidence of discrimination in this record; nor is there any reason to believe that any shipper or any competing motor carrier was harmed by the negotiated rate or by the failure to file it. The only consequence of today's misguided decision is to produce a bonanza for the bankruptcy bar. "Now that off-tariff pricing is harmless to the (de)regulatory scheme, the only purpose served by making the statutory obligation to price in conformity with published tariffs draconian is to provide windfalls for unsecured creditors in bankruptcy." *Orscheln*, 899 F. 2d, at 646.

As Justice Black said more than 30 years ago in similar circumstances, "I am unable to understand why the Court strains so hard to reach so bad a result." *T. I. M. E. Inc.* v. *United States*, 359 U. S. 464, 481 (1959) (dissenting opinion). The Court's analysis is plausible only if read as a historical excursus about a statute that no longer exists. Nothing more than blind adherence to language in cases that have nothing to do with the present situation supports today's result.

I respectfully dissent.