**GRAY LINE NATIONAL TOURS CORPORATION, Plaintiff,**

v.

**UNITED STATES of America and Interstate Commerce Commission, Defendants,**

**Manhattan Transit Co., et al., Defendants-Intervenors.**

**Civ. A. No. 73–3817.**

United States District Court, S. D. New York.

Argued June 11, 1974.

Decided July 31, 1974.

**264**

S. Harrison Kahn, Washington, D. C. (Irving Levin, New York City, of counsel), for plaintiff.

Arthur J. Cerra, Dept. of the General Counsel, I. C. C., Washington, D. C. (Thomas E. Kauper, Asst. Atty. Gen., and John H. D. Wigger, Dept. of Justice, Washington, D. C., Paul J. Curran, U. S. Atty., S.D.N.Y.; Fritz R. Kahn, Gen. Counsel, and James Kurth, and Peter A. Fitzpatrick, I. C. C., Washington, D. C., of counsel), for defendants.

Charles J. Williams, Madison, Tenn., for defendant-intervenor National Tour Brokers Ass'n.

Robert E. Goldstein, New York City, for defendants-intervenors Manhattan Transit, Campus Travel and Trailways Travel.

L. C. Major, Jr., Alexandria, Va., for defendants-intervenors Greyhound Lines, Inc., and others.

Francis V. Goggins, New York City, for defendant-intervenor Tauck Tours, Inc.

Before FRIENDLY, Circuit Judge, and FRANKEL and WARD, District Judges.

FRIENDLY, Circuit Judge:

Plaintiff Gray Line National Tours Corporation (GLNT) is a wholly-owned subsidiary of Gray Line Sightseeing Companies Associated, Inc. (GLA), which is an association of companies in many cities in the United States and abroad. The members offer local sightseeing tours, often under the rubric "Gray Line". Some of the United States members have authority to engage in the motor carriage of passengers; more do not.

GLNT brought this action to set aside an order of the Interstate Commerce Commission, 114 M.C.C. 914 (1972), which denied its application for a brokerage license under § 211 of the Interstate Commerce Act.[1] Plaintiff had sought authority to operate as a broker at all points in the United States, in arranging for transportation in interstate or foreign commerce of passengers and their baggage, in all types of passenger

---

1. The first sentence of § 211(b) provides:

   A brokerage license shall be issued to any qualified applicant therefor, authorizing the whole or any part of the operations covered by the application, if it is found that the applicant is fit, willing, and able properly to perform the service proposed and to conform to the provisions of this chapter and the requirements, rules, and regulations of the Commission thereunder, and that the proposed service, to the extent to be authorized by the license, is, or will be consistent with the public interest and the national transportation policy declared in this Act; otherwise such application shall be denied.

   49 U.S.C. § 311(b).

service, between points in the United States, including Alaska and Hawaii. The Hearing Examiner had recommended the grant of a more limited license, authorizing operation as a broker in arranging for transportation by motor vehicle in interstate or foreign commerce of passengers and their baggage in all-expense sightseeing and pleasure tours within this country, and restricted against originating or arranging for the origination of traffic at New York, N. Y., and Boston, Mass., and points within 50 miles of each, and at San Francisco, Calif.[2] The Commission, acting through Division 1, based its denial on two grounds. One was the inadequacy of the evidence to show that GLNT would "contribute something of value or be of benefit to carriers or the public," the test adopted by the full Commission in Carla Ticket Service, Inc., Broker Application, 94 M.C.C. 579, 581 (1964).[3] The other was what the Division regarded as an undesirable relationship of GLNT with motor common carriers of passengers, to wit, members of GLA holding operating authority.[4]

Since this aspect of this subsection of the Interstate Commerce Act has apparently been the subject of only one reported court decision in the nearly forty years it has been on the books, Collette Travel Service, Inc. v. United States, 263 F.Supp. 302 (D.R.I.1966) (Aldrich, J.), some account of its legislative history may be useful, meagre though that turns out to be. As is well known, the sources of the Motor Carrier Act of 1935 were the ICC's report on Coordination of Motor Transportation, 182 I.C.C. 263 (1932), and three reports of Commissioner Joseph B. Eastman in his capacity as Federal Coordinator of Transportation during the Great Depression, S. Doc. No. 119, 73d Cong. 2d Sess. (1934), S. Doc. No. 152, 73d Cong. 2d Sess. (1934), and H.R. Doc. No. 89, 74th Cong. 1st Sess. (1935). The ICC report

2. The reason for the territorial restriction was that Gray Line companies were already offering all expense tours at these points, and that the Boston GLA member actively opposed the application while the New York and San Francisco Gray Line companies were owned and controlled by opponent Greyhound. The examiner also pointed out that "[t]here are a number of brokers, as well as carriers conducting special operations, in the New York City area (embracing parts of New Jersey) which offer tours or services throughout the United States." Although GLNT excepted to the territorial restriction before the Commission, it does not seriously press the point in this court. It also plainly does not object to the Hearing Examiner's proposed limitation of the license to "all-expense sight-seeing and pleasure tours, between points in the United States," which limitation did not deny GLNT anything it really wanted.

3. In that decision the Commission added that "[c]onsideration of existing broker service is, therefore, relevant in broker applications for it is obvious that the creation of needless duplicative services will neither advance the primary purpose of section 211 nor be of benefit to anyone." 94 M.C.C. at 582. In Elegante Tours, Inc.—Broker Application, 113 M.C.C. 156, 158 (1971), Division 1 went a bit further in making the requirement that the service "not be needlessly duplicative of existing facilities" an independent criterion. "Needlessly" is a loaded word. If it means only that an applicant must show that he will furnish "something of value" not being offered by brokers already licensed—and perhaps this "something of value" could be just additional competition in a market well able to support it, compare Paragon Travel Agency, Inc. Extension—Atlanta, Ga., No. MC–12645 (Sub-No. 6) (Div. 1, May 23, 1974), slip op. at 6–7—then any additional requirement is itself needless; if it means that an applicant who will furnish "something of value" will be denied a license if already licensed brokers could fill the need, or indeed are filling it but in a competitively lax manner in a situation of strong demand, then it seems to run counter to the actual decision in Carla and arguably to the statute, despite the discussion in Carla, supra, 94 M.C.C. at 581–82. See also Collette Travel Service, Inc. v. United States, 263 F.Supp. 302, 304 (D.R.I.1966).

4. Division 1 acting as Appellate Division subsequently denied GLNT's petition for reconsideration and oral argument; the full Commission then denied GLNT's petition for a determination and announcement that the proceeding involved an issue of general transportation importance, see I.C.C. Rule 101(a)(4).

took note of the brokerage problem, saying at 182 I.C.C. at 279–80:

> With the development of long-haul motor transportation of passengers there has grown up in many cities the practice of selling transportation by agencies which do not represent any regular bus line. The practices of these agencies have given rise to many of the complaints registered by interstate bus passengers. The agencies advertise rates appreciably less than the fares of regular bus lines and then make arrangements with irregular operators, frequently the owners of private automobiles, to transport the passengers, the agency retaining a per cent of the fare collected as commission.

Its solution was to limit brokerage in passenger transportation to certificate holders, *id.* at 386.

The first of the two relevant reports of the Coordinator, S. Doc. No. 152, *supra*, at 45–49, 359, recommended regulation of "transportation agents or brokers" but said only that brokers should have to obtain a "permit", without specifying the standard. The second report, which recommended what became § 211, is more informative. It said, H.R. Doc. No. 89, *supra*, at 61–62:

> Provision for more thorough-going regulation of brokers or transportation agents is made in the bill. To avoid confusion, the term "license" instead of "permit" is applied to the authority issued for brokerage operations. Licenses are required of all persons selling tickets or making contracts, agreements, or arrangements to provide transportation of persons or property in interstate or foreign commerce. Exemption of the agents of carriers holding certificates or permits is provided.
>
> A showing of public interest and financial responsibility is a condition to the issuance of a license. The Commission shall make reasonable rules and regulations and require bond to protect the traveling or shipping public. These licenses are subject to revocation, as provided in section 312.
>
> A desirable control over transportation effected through brokerage operations is afforded by the provision which requires brokers to employ only carriers holding certificates or permits. If the broker or transportation agent himself performs any transportation, through agents or employees or by lease of equipment, he must secure a form of carrier authority, either a certificate or a permit, and take on the duties and responsibilities and subject himself to the regulation provided for motor carriers.
>
> The Commission may prescribe the forms of brokers' accounts and require reports. It may also enforce appropriate penalties for unlawful operations.

The brief Senate Report on what became the Motor Carrier Act, S.Rep.No.482, 74th Cong. 1st Sess. (1935), says nothing about brokers and the House Report, H.R.Rep.No.1645, 74th Cong. 1st Sess. at 4 (1935), contains simply a condensed version of § 211(b), indeed omitting any reference to "the public interest and the national transportation policy," *see* note 1 *supra*.

▉ In light of this history we cannot quarrel with the Commission's analysis in *Carla, supra*, 94 M.C.C. at 580–81:

> The legislative history of section 211 of the act clearly reveals that the primary purpose of Congress in regulating motor transportation brokers is to protect carriers and the traveling and the shipping public against dishonest and financially unstable middlemen in the transportation industry. Although this may be the primary objective of section 211 of the act, it does not follow that this is the sole objective of section 211. If financial integrity and stability were the sole aim of regulation in this area, it would have been sufficient for Congress to have formulated a statutory standard in section 211(b) of the act which would

have limited our function in broker application proceedings to determining whether or not the applicant is fit, willing, and able to perform the proposed service. Instead, the statutory standard formulated by Congress in section 211(b), in terms of which all broker applications must be evaluated, requires us to find (1) that the applicant is fit, willing, and able to perform the proposed service, and (2) that the proposed brokerage operation is or will be consistent with the public interest and the national transportation policy. As a matter of statutory construction, no word or clause in a statute should be rejected as superfluous or meaningless, but must be given its due force and meaning appropriate to the context, albeit not a strained or unnatural meaning. *Cf.*, Keystone Transp. Co. Contract Carrier Application, 19 M.C.C. 475, 492. The "public interest" aspect of the involved statutory standard obviously encompasses a broader range of deliberation than does the "fitness" aspect of the statutory standard. Therefore, it seems clear to us that Congress intended, by requiring consideration of the "public interest" in section 211(b) of the act, that our evaluation of broker applications on their merits not be limited to the issue of an applicant's fitness.

*See also* Collette Travel Service, Inc., *supra*, 263 F.Supp. at 304.[5]

██ Neither can we fault the Commission for its application of those criteria here, even if its articulation of its reasoning was at times less clear than might have been wished. The breadth of the license sought by GLNT and its potential effect on brokers throughout the country imposed a corresponding obligation with respect to proof. GLNT seems to have opted for quantity rather than quality. It called no potential users of its service but rested primarily on travel agents and airlines.[6] The bulk of the agents' testimony was along the more-the-merrier lines customary with such witnesses in certification proceedings. They offered little if any testimony that GLNT would supply anything different from what was available through existing brokers; indeed, they generally were not very familiar with what GLNT's proposal comprised. The airline testimony was only a shade better. The airlines, many of whose appearances in support of the application were justifiably stricken by the Commission in any event, *see* note 6 *supra*, were largely uninterested in the long tours that formed a considerable part of the proposal.[7] A suggestion from the bench that the "something of value" might lie in providing a large airline, particularly one operating internationally, with the

5. We do not read any of the later cases cited by plaintiff, *e. g.*, Paragon Travel Agency, Inc., Extension—Massachusetts and Rhode Island, 100 M.C.C. 641 (1966) (Division 1, Acting as Appellate Division); Paragon Travel Agency, Inc., Extension—Providence, R.I., 110 M.C.C. 639 (1969) (Division 1, Acting as Appellate Division); Russel Ricker Cook, Sr., Broker Application, No. MC–130145 (Division 1, Acting as Appellate Division, April 1, 1974); Paragon Travel Agency, Inc., Extension—Atlanta, Ga., No. MC–12645 (Sub-No. 6) (Division 1, May 23, 1974), as applying a more liberal test than that applied in *Carla*, *cf.* note 3 *supra*.

6. While plaintiff accurately cites Collette Travel Service, Inc., *supra*, 263 F.Supp. at 305–306, for the proposition that testimony by potential users is not requisite, or at times even very revealing, the alternative

mode of building a case suggested by that opinion, demonstration of unfilled need by reasonably scientific market research, was not even attempted here.

Plaintiff also attacks as "arbitrary" the granting by the Commission of protestants' motion to strike the testimony of a number of the travel agent and airline witnesses on the ground that these were not properly identified by GLNT prior to the hearings, pursuant to special rules established by the Hearing Examiner to which GLNT had agreed. The Commission's action in this regard was perfectly justified, for the reasons stated in its opinion, 114 M.C.C. at 916–18.

7. GLNT now concedes, moreover, that a number of the proposed longer tours were copied from those of existing brokers—grammatical errors and all.

ability to deal with a single broker at all points in the United States, wherever its passengers might desire all-expense tours, was greeted with enthusiasm by counsel for GLNT but finds no sufficient record support. In any event, approval of such an argument would demand more detailed examination than the Commission was required to make, on the evidence before it, of how far existing brokers, particularly intervenors Greyhound Highway Tours, Inc., Trailways Travel Bureau Corporation, and even Continental Trailways Tours, Inc., already fill this bill; examination would also have been required of how far GLNT's potential contribution in this respect might be reduced by the restriction against originating tours at such attractive points as New York, Boston and San Francisco, and perhaps by inability to originate tours at other points where Gray Line members do not wish to participate in the service. Against this background of deficient evidence,[8] little weight can be given to the Hearing Examiner's imprecise assertions that "[t]he population of this country is increasing rapidly," that our "standard of living" is improving, that "more people are interested in travel and are availing themselves of existing tour services," and that "[a] grant . . . would not in the examiner's opinion materially affect the protestants herein," *cf*. note 6 *supra*.[9]

■ While it is not necessary for us to reach the Commission's alternate ground of decision, a court could surely not quarrel with the Commission's adopting a general principle, as it has purported to do in Albright Broker Application, 83 M.C.C. 406, 409–10 (1960) (Division 1); *see also* Cain Broker Application, 2 M.C.C. 633, 636 (1937) (Division 5), that a broker must neither control nor be controlled by a carrier which is a candidate for his business, since the public interest is best fulfilled by his being a neutral who will select among carriers on a merit basis. Not seriously disputing this, GLNT says that the Commission has not consistently applied any such principle and that the invocation of it here was therefore arbitrary and capricious.[10] It cites particularly Kerrville Tours, Inc., Broker Application, 100 M.C.C. 270 (1965), and T. N. M. & O. Tours, Inc., Broker Application, 100 M.C.C. 279 (1965). But the Commission also cited these cases and of-

---

8. The remaining testimony in support of the application, apart from that of several miscellaneous witnesses who did not add a great deal, was provided by a number of GLA members. The self-serving nature of this evidence is apparent. Moreover, the plans for tours propounded and supported by many of these witnesses simply did not correspond to anything proposed by applicant's operating witness.

9. Plaintiff argues that:

Perhaps the most egregious error is the denial of the application to originate tours in most areas in the United States when no broker or motor carrier appeared to protest for virtually any area outside of the hearing sites. With no protestants, competition is an unimportant consideration, and even minimal carrier support should be sufficient for the grant of the application at those points.

But GLNT did not press before the Commission for any particular authority on a lesser scale than that recommended by the Hearing Examiner—nor could it very well have done

so, considering its apparent failure to have given much thought to its planned mode of operations. The argument now made by plaintiff in this regard is simply an effort to shift the burden of proof in this proceeding to every local broker in the country. *Cf*. Blue Way Trailways, Inc., Common Carrier Application, 21 M.C.C. 421 (1940) (Division 5), modified in other respects on reconsideration, 29 M.C.C. 61 (1941) (Division 5).

10. We have recast the argument in terms of the relevant section of the Administrative Procedure Act, 5 U.S.C. § 706. GLNT puts the point more turgidly, saying that "Not only is such [the Commission's] reasoning a paradigm of obfuscation, but a paradign of 'contrary to law' as well."

We see no merit in plaintiff's additional contention that the general principle should necessarily be inapposite here since GLNT would be subject directly to the control simply of GLA, and only indirectly to the control of such of GLA's members as hold carrier authority.

fered at least a plausible explanation for the apparent inconsistency:

> Those cases, however, were generally not opposed by brokers or motor common carriers of passengers, and the issuance of a license in each case was approved after the evidence established that the public interest would best be served by the availability of broker services even though the broker was affiliated with a motor carrier. Here, however, the opposition is present, the possibility of preference and prejudice does exist, and no public benefits have been shown for waiver of the important principles cited in the *Cain* and *Albright* cases, *supra.*

114 M.C.C. at 923. While we are not as fully convinced as the Commission that all its decisions on this point are perfectly reconcilable, we would have difficulty in holding that, with respect to an agency not bound by strict rules of *stare decisis, see, e. g.*, Virginian Railway Co. v. United States, 272 U.S. 658, 665–666, 47 S.Ct. 222, 71 L.Ed. 463 (1926), any inconsistency rises to the level of arbitrariness or caprice. At argument we were more concerned with the fact that two opponents of GLNT's application, intervenors Greyhound Highway Tours, Inc. and Trailways Travel Bureau Corporation, hold nationwide brokerage authority of the same type here sought, although they are affiliates of large interstate passenger motor carriers. But their brokerage authority was granted, albeit initially for more limited operations, 32 years ago, only seven years after the Motor Carrier Act was passed, National Trailways System Broker Application, 41 M.C.C. 411 (1942), despite the problem of common control and management, because of a strong proven need in view of the dearth of similar broker services then available. The case thus stands quite differently than if the Commission had granted such authority to Greyhound and Trailways but denied it to GLNT at or about the same time. To put the point in another way, we would see nothing arbitrary or capricious in the Commission's saying that

the principle of neutrality is not an absolute but one that will call for denial of an application in the absence of strong countervailing factors. In any event, the Commission's first ground is sufficient to sustain its decision.

We assume, of course, that the denial of GLNT's application does not prevent its presenting another that would be better supported, and formulated so as to meet the Commission's conflict of interest objections.

The complaint is dismissed.