**MILAN EXPRESS CO., INC., and Nashville Country Express, Inc.**

**v.**

**WESTERN SURETY CO., Old Republic Surety Co., Lawyers Surety Co., Northwest National Insurance Co., and State Surety Co.**

**No. 3:87–0730.**

United States District Court, M.D. Tennessee, Nashville Division.

April 29, 1992.

William Preston Sutherland, Watkins, McGugin, McNeilly & Rowan, Nashville, Tenn., Henry E. Seaton, Washington, D.C., for plaintiffs.

Charles William McElroy, Eugene N. Bulso, Jr., Boult, Cummings, Conners & Berry, Roland M. Lowell, Leitner, Warner, Moffitt, Williams, Dooley, Carpenter & Napolitan, Nashville, Tenn., for defendants.

MEMORANDUM

JOHN T. NIXON, Chief Judge.

Plaintiffs, Milan Express Co. and twenty-eight other motor carriers that transport goods by truck in interstate commerce, filed this action seeking a declaratory judgment under 28 U.S.C. § 2201 against defendant insurers who have issued bonds to various property brokers. "Property brokers" are intermediaries who hire motor carriers to ship goods in interstate commerce for the benefit of third parties. These bonds, required under the Motor Carrier Act of 1935, 49 U.S.C. § 211(c), now codified at 49 U.S.C. § 10927(b),[1] insure against losses caused by brokers.

In this case, plaintiffs have transported goods under contract for certain property brokers who were insured by defendants and who failed to pay for the services rendered. These brokers received payment from shippers, but failed to pay the motor carrier for the shipment. Plaintiffs assert that their losses are covered by the defendants' bonds and claim entitlement to the proceeds of the bonds when property brokers fail to pay motor carriers. The substantive issue in this action is, therefore, whether the plaintiff motor carriers may make direct claims on defendants' surety bonds under the Motor Carrier Act, ICC regulations, and the terms of the bonding agreements.

The Magistrate, in a lengthy and thorough report, has recommended that this Court grant plaintiffs' summary judgment motion. Defendants' object on the grounds that the unambiguous language of the statute in question mandates summary judgment for the defendants.[2]

BACKGROUND

In earlier proceedings in this litigation, the Court dismissed this action for lack of subject matter jurisdiction on the grounds that plaintiffs' claims were governed by state contract law and that the claims involved did not satisfy the jurisdictional amount under the diversity statute, 28 U.S.C. § 1332. On appeal, the Sixth Circuit reversed, concluding that the bonds at issue were prescribed by the ICC and federal regulations, causing plaintiffs' claims to arise under federal law. *Milan Express Co. v. Western Surety Co.*, 886 F.2d 783, 789 (6th Cir.1989). In the Sixth Circuit's decision, the critical and material facts in this case, which are undisputed, were succinctly set forth as follows:

In the interstate surface transportation industry, the ICC licenses property brokers: middlemen who arrange transportation services between motor carriers and shippers of various products. Surety companies post bonds on behalf of the brokers, who bill the shippers and pay the motor carriers they retain. Each bond carries a penalty limited to $10,000.00. In the case at bar, the brokers received payments from the shippers for freight, but allegedly failed to disperse payments to the plaintiff motor carriers. Plaintiffs then sought to recover against the bonds posted on behalf of the brokers. Defendants denied plaintiffs' claims because the surety agreement's language discussed only the "protection of travelers and shippers," and did not name "motor carriers." *See* Broker's Surety Bond Under Section 211(c) of the Interstate Commerce Act, Form BMC–84 (Rev.1977).

To protect motor carriers and the shipping public, the ICC will issue a broker's license only if the applicant files a bond or other type of security approved by the ICC. 49 U.S.C. § 10927(b). If a bond is filed, the broker must use the ICC's prescribed Form BMC–84. *See* 49 C.F.R. § 1043.4(b). The original language of Form BMC–84 identified travelers and shippers, but not motor carriers, as intended beneficiaries of the bonds. How-

---

**1.** At one time in its history, this section was codified as 49 U.S.C. § 311(c). The Motor Carrier Act of 1935 is now incorporated into the Interstate Commerce Act.

**2.** Plaintiffs' have also requested class certification, which the Magistrate recommends the Court grant. The Court will not address this issue in this Memorandum, but will instead adopt the Magistrate's Report and Recommendation in a contemporaneously filed Order.

ever, on April 9, 1987, the ICC defined the parameters of its insurance regulations, stating that it "has always interpreted the security offered by brokers to cover both shippers and motor carriers." *Clarification of Insurance Regulations,* 3 I.C.C.2d 689, 692 (1987). "As a matter of clarity," the ICC concluded, "we are modifying the language of the prescribed Broker Surety Bond, Form BMC–84 (Rev. 77), to specifically identify motor carriers as well as shippers as entities included within the intended statutory coverage." *Id. See also* Broker's Surety Bond Under 49 U.S.C. § 10927, Form BMC–84 (Rev.1987).

*Milan, supra,* at 784.

Defendants move for summary judgment on two main grounds: (1) that plaintiffs are not within the meaning of the phrase "travelers and shippers" within the Motor Carrier Act or the surety bonds at issue; and (2) that the ICC's interpretation of the Motor Carrier Act, which permits direct suits by motor carriers on the surety bonds, is a recent interpretation which goes against the unambiguous language of the statute and does not change the contractual intent of the parties to the bonds.

Plaintiffs respond with their own motion for summary judgment, arguing (1) that the ICC has repeatedly and consistently interpreted these bonds as covering motor carriers who are not paid by their property brokers; (2) that the legislative history of the Motor Carrier Act, and the relevant federal regulations and administrative rulings, reveal a clear purpose to cover motor carriers under surety bonds which property brokers are required to post; and (3) that other courts have found motor carriers to be covered by the bonds at issue. Plaintiffs also assert that custom and usage in the insurance industry has recognized and paid motor carrier claims in similar circumstances.

### DISCUSSION

The dispute in this instance centers upon the pre–1978 language of the Act which provided that

[t]he Commission shall prescribe reasonable rules and regulations *for the protection of travelers or shippers by motor vehicle,* to be observed by any person holding a brokerage license, and no such license shall be issued or remain in force unless such person shall have furnished a bond or other security approved by the Commission in such form and amount as will insure financial responsibility and the supplying of authorized transportation in accordance with contracts, agreements, or arrangements therefor.

49 U.S.C. § 311(c) (1976) (emphasis added). From this language, the ICC created Form BMC–84, the form used by surety companies in supplying bonds to brokers. The form continued to use the terms "travelers and shippers" without explicit comment from the ICC until the Commission issued *Clarification of Insurance Regulation,* 3 I.C.C.2d 689 (1987). In that decision, the ICC observed that "[t]he Commission has always interpreted the security offered by brokers to cover both shippers and motor carriers." They went on to modify the language of Form BMC–84, "as a matter of clarity." *Id.* at 692.

As observed in *Gray Line National Tours Corp. v. United States,* 380 F.Supp. 263, 265 (S.D.N.Y.1974), the legislative history of this portion of the Motor Carrier Act is meager. Nevertheless, the ICC, which played a substantial role in the development of this legislation, has handed down a number of relevant decisions interpreting the Act's provisions. As early as 1936, the ICC read the broker bonding requirement of the Act as ensuring the "financial responsibility" of brokers and the "supplying of authorized transportation in accordance with contracts, agreements, or arrangements therefor." *Motor Carrier Insurance for Protection of the Public,* 1 M.C.C. 45, 50 (1936). The ICC also considered the Act to give the Commission discretion to issue "reasonable rules and regulations governing the filing and approval of surety bonds and policies of insurance which we may require as a condition to the issuance of a certificate, permit, or license." *Id.* at 54. The bond's function was to "supplement [the broker's] financial

ability to properly perform the proposed service." *Carl Monroe Cain*, 2 M.C.C. 633, 637 (1937).

Nearly twenty years later, the ICC observed that a broker was "primarily liable" for arrangements made with motor carriers.

> The carrier normally would rely upon the responsibility of the broker with whom it dealt. The broker having contracted with the travelers to provide an all-expense tour, as between the travelers and the broker, the broker would be primarily liable, and in the extremely unlikely event that a traveler should be called upon by the carrier to pay the charter fare, or any part thereof, the broker would be bound to exonerate or indemnify the travelers.

*Tauck Tours, Inc.*, 63 M.C.C. 493, 495 (1955). In *Carla Ticket Service, Inc., Broker Application*, 94 M.C.C. 579 (1964), the ICC determined that "the primary purpose of Congress in regulating motor transportation brokers is to protect *carriers* and the traveling and shipping public against dishonest and financially unstable middlemen in the transportation industry." *Id.* at 580 (emphasis added). This analysis was expressly approved by Judge Friendly in the *Gray Line* case. 380 F.Supp. at 266. In 1980, the ICC observed that the "[f]ailure [of brokers] to pay transportation bills is guarded against through the Commission's requirement of a surety bond. If the bond is revoked, a broker may not continue to operate until a valid bond is obtained. *See* 49 U.S.C. § 10927(b)." *Property Brokers Practices*, 132 M.C.C. 233, 234 (1980).

■ From these decisions, the ICC has expressed a clear and consistent interpretation of the Act's provisions requiring brokers to post surety bonds. One of the principal purposes of the Act is the economic welfare of motor carriers and sound business practices of brokers. The Act grants the ICC broad discretion to fashion requirements for brokers' bonds to ensure the financial responsibility of brokers. The ICC has consistently interpreted these bonds to protect motor carriers from unpaid freight charges and such interpretations are in accord with the mandate and purposes of the Act. To finally resolve any questions in this regard, the ICC issued a decision summarizing its prior rulings and clarifying its position concerning the surety bonds.

> The Commission has always interpreted the security offered by brokers to cover both shippers and motor carriers.... Freight bills are, of course, issued by motor carriers, not by shippers. We also note that in our experience we receive few if any requests by shippers for bond recovery. . Invariably, the person harmed in these transactions is the motor carrier, which, though it has provided the transportation, has not received its transportation charges.
>
> As a matter of clarity, we are modifying the language of the prescribed Broker Surety Bond, Form BMC 84 (Rev. 77), to specifically identify motor carriers as well as shippers as entities included within the intended statutory coverage....
>
> Comments are not required because the ... bond revisions clarify existing rules and as such are interpretative. 5 U.S.C. 553(b)(a). Indeed, as explained above, [the] change will [not] substantially change established agency interpretations of the ... bond requirements.... [T]he bond changes merely codify longstanding agency precedent.

*Clarification of Insurance Regulations*, 3 I.C.C.2d 689, 692–93 (1987).

The ICC has since adopted regulations expressly specifying that the bonds are to ensure the financial responsibility of brokers "by providing for payments to shippers *or motor carriers* if the broker fails to carry out its contracts, agreements, or arrangements for the supplying of transportation by authorized motor carriers." 49 C.F.R. § 1043.4(b) (Oct. 1990). In adopting interim guidelines which preceded these regulations, the ICC noted that requiring brokers to post surety bonds provided "at least a limited source of funds available from which [motor carriers] may collect some or all of the monies owed to them." *Property Broker Security for the Protec-*

*tion of the Public,* 3 I.C.C.2d 916, 921 (1987).

The crux of defendants' argument is that these ICC interpretations of the Act contravene the plain language of the statute. The Supreme Court has not hesitated to disagree with a regulatory agency's interpretation of a federal law. In *Maislin Industries U.S. v. Primary Steel, Inc.,* 497 U.S. 116, 110 S.Ct. 2759, 111 L.Ed.2d 94 (1990), the Court invalidated the ICC's "filed rate doctrine" as in conflict with the plain language of the Interstate Commerce Act. The Court went on to observe that "[a]lthough the Commission has both the authority and the expertise generally to adopt new policies when faced with new developments in the industry, it does not have the power to adopt a policy that directly conflicts with its governing statute." *Id.* at ——, 110 S.Ct. at 2770. In *Sullivan v. Everhart,* the Court articulated the standards for reviewing challenges to an agency's interpretation of a federal statute.

> We first ask "whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." "In ascertaining the plain meaning of the statute, the court must look to the particular statutory language at issue, as well as the language and design of the statute as a whole." But "if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute," that is, whether the agency's construction is "rational and consistent with the statute."

*Sullivan v. Everhart,* 494 U.S. 83, 88–89, 110 S.Ct. 960, 964, 108 L.Ed.2d 72 (1990) (citations omitted).

The Sixth Circuit has noted that while there is

> "no errorless test for identifying or recognizing 'plain' or 'unambiguous' language[,]" *United States v. Turkette,* 452 U.S. 576, 580, 101 S.Ct. 2524, 2527, 69 L.Ed.2d 246 (1981)[,] [i]t is "fundamental that a section of a statute should not be read in isolation from the context of the whole Act, and that in fulfilling our responsibility in interpreting legislation, 'we must not be guided by a single sentence, but [should] look to the provisions of the whole law, and to its object and policy.'" *Richards v. United States,* 369 U.S. 1, 11, 82 S.Ct. 585, 591–92, 7 L.Ed.2d 492 (1962) (cite omitted); *see also United States v. Thompson,* 669 F.2d 1143, 1145 (6th Cir.1982).

*Blanton v. City of Murfreesboro,* 856 F.2d 731, 734 (6th Cir.1988).

Utilizing these principles, the Court concludes that the Act, as it existed both before 1978 and after, provided the ICC ample authority to regulate the bonds at issue and to determine that motor carriers may recover directly on those bonds. The Motor Carrier Act, as it existed before 1978, stated that the

> national transportation policy of the Congress [is to] provide for fair and impartial regulation of all modes of transportation subject to the provisions of this act ..., so administered as to recognize and preserve the inherent advantages to each; to promote safe, adequate, economical, and efficient service and foster sound economic conditions in transportation and among the several carriers.... All of the provisions of this act ... shall be administered and enforced with a view to carrying out the above declaration of policy.

National Transportation Policy note preceding 49 U.S.C. § 301 (1976). Section 304(a)(4) of the Act empowered the ICC to "regulate brokers as provided in this chapter, and to that end the Commission may establish reasonable requirements with respect to licensing, financial responsibility, accounts, records, reports, operations, and practices of any such person or persons." The Commission was also given explicit authority to determine the qualifications a broker must possess in order to be licensed. *Id.* § 311(b).

The ICC's interpretation of section 311(c), extending the coverage of brokers'

bonds to carrier claims, can be rationally and consistently read into the language of the Act. Section 311(c) reads:

**(c) Rules and regulations; bond or other security required**

The Commission shall prescribe reasonable rules and regulations for the protection of travelers or shippers by motor vehicle, to be observed by any person holding a brokerage license, and no such license shall be issued or remain in force unless such person shall have furnished a bond or other security approved by the Commission, in such form and amount as will insure financial responsibility and the supplying of authorized transportation in accordance with contracts, agreements, or arrangements therefor.

Both the title of this section and the punctuation of the statute indicate that Congress intended this section to perform two functions. The first part requires the Commission to prescribe rules and regulations to protect travelers and shippers; the second requires all licensed brokers to post security to ensure financial responsibility. The second half of the section does not appear to limit the scope of the bonds to travelers and shippers, thereby permitting the ICC to regulate the bonds in any reasonable manner to ensure financial security of the brokers. It is easily argued that the bonds exist to protect carriers as well as travelers and shippers.

The Act has since been amended, and for the past fourteen years has empowered "[t]he Commission [to] issue a broker's license to a person ... only if the person files with the Commission a bond, insurance policy, or other type of security approved by the Commission to ensure that the transportation for which the broker arranges is provided." 49 U.S.C. § 10927(b) (1989). Further, "[t]he Commission may determine the type and amount of security filed with it under this section." 49 U.S.C. § 10927(d) (1989). The Act defines its public policy as the creation of "sound economic conditions in transportation, including sound economic conditions among carriers," 49 U.S.C. § 10101(a)(1)(C), and requires that a broker provide transportation "consistent with the public interest and the transportation policy of section 10101 of this title." *Id.* § 10924(a)(2). From this language, the ICC is given clear authority to interpret the surety bonds as protecting the interests of motor carriers as well as travelers and shippers.

Existing judicial precedent also supports the ICC's interpretation. In what appears to be the only prior federal case interpreting the bond requirement of the Act, Judge Friendly, in *Gray Line, supra,* accepted the ICC's interpretation that the statute existed for the protection of carriers. In its earlier decision in the present case, the Sixth Circuit, in dictum, observed that the bonds required by the Act "are intended to protect motor carriers who fall victim to broker abuse." *Milan,* 886 F.2d at 787. Congress has repeatedly amended the Act since 1935 without interfering with the ICC's determination that carriers are covered by these bonds.

■ Imposition of the ICC's interpretation on these bonds does not violate the contractual intent of the parties. These bonds are "creatures of federal law," *Milan Express,* 886 F.2d at 787, being "required, promulgated, and regulated by the ICC." *Id.* The ICC has discretion to regulate these bonds in order to ensure the financial responsibility of brokers and the Commission has not exceeded its authority in interpreting the Act and the bonds to permit direct recovery by carriers. The contractual intent of the parties is to abide by the federal laws and regulations which require the bonds. Thus, the longstanding precedents and interpretations of the Act by the ICC, as well as its regulations, are properly incorporated into the bonds themselves and do not contravene the intent of the parties. *See Expressco, Inc. v. State Surety Co.,* No. 88–341–II, 1989 WL 155927 (Tenn.Ct.App. Dec. 29, 1989); *Davis Transport, Inc. v. Evergreen, Inc.,* No. 68987 (Mont.Dist.Ct. Mar. 21, 1989). Moreover, other surety companies have paid on carriers' claims against the bonds. *See, e.g. Safeco Ins. Co. v. Criterion Investment Corp.,* 732 F.Supp. 834 (E.D.Tenn. 1989); *Washington Int'l Ins. Co. v. AGS Enterprises, Inc.,* No. 3:87–0682, 1989 WL

306578 (M.D.Tenn. July 26, 1989); *Aetna Casualty & Surety Co. v. Milan Express, Inc.*, No. 3:86–1101, 1987 WL 156202 (M.D.Tenn. May 15, 1987).

In sum, upon consideration of the Act, its legislative history, and both judicial and administrative interpretations of the statute, the Court concludes that the ICC's regulations permitting motor carriers to recover directly against a broker's surety bond were promulgated within its authority under the statute.

## CONCLUSION

For the foregoing reasons, the Court finds that under the Motor Carrier Act of 1935, as incorporated into the Interstate Commerce Act, and the regulations promulgated by the Interstate Commerce Commission, motor carriers may make claims directly against a property broker's security or bond to recover transportation costs as provided under contract. The Court also adopts the Magistrate's Report and Recommendation granting class certification to the plaintiffs.